IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL SOUZA AND | : | |
| ELIZABETH SOUZA | : | |
| | : | |
| VS. | : | CA. No. 0655 ML |
| | : | |
| DOMESTIC BANK | : | |

**DEFENDANT, DOMESTIC BANK'S PRE-TRIAL MEMORANDUM**

Pursuant to F.R.Civ.P. 16 and the Pre-Trial Order of this Court, Defendant, Domestic Bank ("Domestic") hereby submits its memorandum outlining the defense of the case and setting forth supporting law in its defense. The defense further posits that probable length of trial will be approximately five (5) days.

## I. What The Bank Will Show in Its Defense:

The Plaintiffs have brought this claim under the Equal Credit Opportunity Act, 15 USC 1691 et. seq., claiming a technical, not a substantive, violation of the Act by the Bank. It should be noted that the Plaintiffs are not members of a "protected class" as set forth under the statute. In particular, the Plaintiffs claim that the Bank did not provide notice of "adverse action" as to their loan application with the Bank within 30 days of the completion of same and did not provide the actual or "specific reasons" for such adverse action as per 15 USC 1691 subsections (d)(1), (2) and (3) of the Act. The Plaintiffs claim actual damages and are seeking punitive damages as a result of the Bank's decision to deny them credit.

The Bank will show that it complied with the technical requirements of 15 USC 1691(d)(1), (2) and (3) in that it provided the Plaintiffs with written notice of "adverse

action" as to their "Second Chance" loan application within (30) thirty days of obtaining a "completed application" for credit and that the reasons provided for same were "specific" as required under subsection (3) of the Act. Hence, there was no violation of the statute by the Bank.

Plaintiffs, in late November of 2003, applied for a "Second Chance" or Portfolio" loan with Domestic Bank, which was to be used to pay off their Chapter 13 Bankruptcy Debt. At the time the Plaintiffs resided in a single family house at 98 Greenfield Avenue in Portsmouth, Rhode Island. The Plaintiffs had filed for bankruptcy in May of 2003 and called eight to ten lending institutions from the spring of that year to the fall in order to obtain a buyout loan to payoff the bankruptcy debt. All inquires and applications by the Plaintiffs had been summarily denied by other lending institutions. On or about November 25, 2003, the Plaintiffs communicated with the Bank through one of its loan officers. A verbal application was taken over the phone, wherein the Plaintiffs misrepresented to the Bank loan officer that their total mortgage delinquency debt was $170,500.00 with three different mortgagees. The Plaintiffs had personal credit card debt which was also to be covered by the Chapter 13 consolidation plan. On December 9, 2003 the loan officer had written to the Plaintiffs' bankruptcy attorney warning him that the Bank needed an accurate figure on the total mortgage debt so that the Bank would know the exact amount of the loan. An appraisal was done of the Plaintiffs' 98 Greenfield Avenue home on December 18, 2003, wherein the property was evaluated at $275,000.00. On or about December 22, 2003, the Bank issued a letter of tentative approval for the "Second Chance" or "Portfolio" loan to the Plaintiffs' bankruptcy attorney, Peter Iascone, in the amount of $201,100.00. The letter was issued so that the

Plaintiffs' bankruptcy attorney could get the Bankruptcy Court's approval for the proposed consolidation plan. The Bank's stated internal policy for such "Second Chance" or "Portfolio" loans is that the loan amount, as compared to the appraised value of collateral/home, is not to exceed 70 percent. This tentative approval was an exception to the normal practices of the Bank since the proposed loan amount as compared to the appraised value of the house was 73 percent. Significantly, the decision of the Bank to tentatively approve the loan was based on the erroneous mortgage delinquency figures provided by the Plaintiffs during the verbal application process in November and based on the erroneous confirmation of same by their bankruptcy attorney Peter Iascone in mid December of 2003.

On New Year's Eve, December 31, 2003 at 2:00 pm, Mr. Iascone faxed a revised, previously unknown and a higher delinquent mortgage pay off debt to the Bank. The new and additional delinquent mortgage debt of the Plaintiffs was in fact $10,300.00 more than represented to the Bank by the Plaintiffs and their bankruptcy attorney in November and mid December of 2003. The new pay off figure and increased delinquent mortgage debt caused the amount of the "buyout" loan to increase proportionately to $211,000.00. The Bank, given the holiday, did not learn of the new figure until the next business day, to wit, January 2, 2004. The Bank, given this new information and now confronted with a higher than expected loan, called the Plaintiffs so that it could perform a second internal appraisal of the property in order for it to be sure that the collateral was secure. A second internal appraisal is the normal procedure and the policy of the Bank, under certain circumstances, such as the Plaintiffs, when the Bank is considering a high risk loan such as the one in question. The second site appraisal was done on January 8,

2004. The appraiser for the Bank discovered that two additions were done to the rear of the house in 1998 and 1999. The appraiser for the Bank requested that the Plaintiffs produce work permits from the town in order to make sure that the additions had proper approval and that the town had no possible encumbrance against the collateral. Given the unexpected increase in the loan amount, this was of particular importance to the Bank.. The permits were obtained by the Plaintiffs from the Town Hall on January 8, 2004 and were faxed to the Bank at about 1:48 pm that day. At this point, the loan application was "completed" in accordance with the Bank's practices for the type and amount of loan at issue. Given the added mortgage delinquency debt of the Plaintiffs and the resulting increase in the loan amount, the Bank denied the Plaintiffs' application. The adverse action was communicated to the Plaintiffs verbally in late January of 2004 and was confirmed in a written communication dated February 5, 2004. The denial letter was sent to the Plaintiffs some twenty eight (28) days after the loan had been competed on January 8, 2004. The Bank used the Federal Reserve Board's recommended list of reasons for adverse action, indicating that the "specific reason" for denial was due to the extent of the Plaintiffs' "Delinquent credit obligations".

Based on the above, the Bank will show that the Plaintiffs' claims are without merit. Since there was no violation of the Act the Plaintiffs are not entitled to actual damages, punitive damages or attorneys fees.

## II. Applicable Law:

15 USC 1691, or the Equal Credit Opportunity Act (hereinafter, the "ECOA") was enacted in order to proscribe discrimination by a creditor to an applicant for credit on the basis of race, color, religion, national origin, sex, marital status or age. Bhandari v.

First National Bank of Commerce 808 F. 2d 1082, 1987 App. Lexis, 1528 9 (5th Cir. Ct. App. 1987). Besides substantive violations, a creditor applicant may allege procedural flaws and maintain a cause of action for same. Id. The Specifically, under subsection (d)(1) (2) and (3) of 15 USC 1691, a creditor must provide written notice to an applicant of adverse action within thirty (30) days of obtaining a "completed application" for credit and in so doing must also provide the "specific reasons" for the adverse action taken. Id. Any action brought under subsection (d) (1) (2) and (3) sounds in tort. It is not a strict liability statute. Vander Missen v. Kellog- Citizens Nat'l Bank 83 FRD 206, 28 FR Serv. 2d 563 (1979, ED Wisc.). As 15 USC 1691(d), et seq., states:

> (d) Reason for adverse action; procedure applicable; "adverse action" defined.
>
> (1) Within 30 days (or such longer reasonable time as specified in regulations of the Board for any class of credit transaction) after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.
>
> (2) Each applicant against whom adverse action is taken shall be entitled to a statement of the reasons for such action from the creditor. A creditor satisfies this obligation by –
>
> (A) Providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; …
>
> (3) A statement of reasons meets the requirements of this section only if it contains the specific reasons for the adverse action taken. …
>
> (6) For purposes of this subsection, the term "adverse action" means a denial or revocation of credit…
>
> See, 15 USC 1691 (d) (1), (2), (3) and (6).

In this matter the Plaintiffs, as set forth in their compliant, have alleged two procedural or technical defects as to the Bank's notification to them of the adverse action taken by the Bank on their Chapter 13 "Second Chance" or "Portfolio" loan application. They allege that the Bank failed to comply with the thirty day notice requirement and that

the Bank failed to provide the actual or "specific reasons" for adverse action. For the reasons discussed below the Plaintiffs' claims are without merit.

**A. 30 Day Notice Rule:**

The computation of the 30 days within which to provide written notice of adverse action to an applicant commences once the creditor is in receipt of a "completed application." Thus a key issue in this case is when the application of the Sousa's was "completed" within the meaning of Subsection (d)(1) so that it can be determined if, by virtue of the February 5, 2004 letter of adverse action, the Bank complied with the statue.

After enacting the "ECOA" Congress directed The Federal Reserve Board to issue regulations implementing and defining the statutory language of 15 USC 1691. Higgins v. J.C. Penny, Inc., 630 F. Supp. 722, 1986 US Dist. LEXIS 29042 (USDC, E. Dist., Mo. 1986). It has been held that the Courts must give "deference" to the language of the regulations as compiled by the Federal Reserve Board. Id. at p. 723. Pursuant to Congress' request, the Federal Reserve Board drafted Regulation B, 12 CFR 202.2, to guide the Courts and help in determining when an application for a loan is deemed "completed" under the statute. In that regard, Regulation B states, in pertinent part:

> "Application means an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested.... A completed application means an application in connection with which a creditor has received all the information that a creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested (including, but not limited to, credit reports, any additional information requested from the applicant, and any approvals or reports by governmental agencies or other persons that are necessary to guarantee, insure, or provide security for the credit or collateral).
>
> See, Section 202.2 (f). (emphasis added).

Thus under the clear and unambiguous language of Section 202.2(f), a creditor has wide internal latitude in determining what kind and amount of information it will need from an applicant so as to deem an application for credit as being completed. James A. Faulkner v. Daniel Glickman, 172 F. Supp. 2d 732, 737; 2001 US Dist. LEXIS 18868 (USDC, Dist. of Md., 2001). As stated in the Regulation itself, the creditor may require the production of governmental agency documents in order to ensure the status of the collateral, if same is ordinarily done by the creditor for the type and amount of credit in question. Id. at p. 737; See Also, Riggs National Bank of Washington, DC v. Webster 832 F. Supp. 147 (D. Md. 1993); High v. McLean Financial Corp., 659 F. Supp. 1561 (D.D.C., 1987); 12 CFR 202.2(f).

In Faulkner, Supra, the United States District Court for the District of Maryland addressed the issue of when an application for credit is deemed completed under 15 USC 1691(d)(1). In that case, the Plaintiff, a dairy farmer, sought to obtain a $30,000 operating loan from the federal government to purchase cows. Id. at p. 733. At the time the Plaintiff was in financial distress and had recently been divorced. Id. He applied for the loan in question on November 6, 1995. Id. Mr. Faulkner, as part of his divorce settlement, had planned to transfer a 26.5 acre tract of land to his ex-wife. Id. On or about December 14, 1995, the federal government advised Mr. Faulkner that in order to complete the application he would need to submit a deed of the 26.5 acre parcel by December 22, 1995. The government wanted to assert a lien on the parcel in order to secure the $30,000 loan. Id. at p. 737. Mr. Faulkner never submitted the deed as requested and the government took adverse action on the loan, denying the application on February 27, 1996. The Plaintiff claimed that the government violated Section 15 USC

1691(d) (1) asserting that it did not provide notice of adverse action with thirty days of completion of the application. The Plaintiff claimed that the application was completed on December 21, 1995 when he submitted some information as to his assets, which, admittedly, did not include the legal description or the deed to the tract of land. Id. at p.734 -737. The government asserted that the application was never completed as the additional information it requested (a deed) was something that the government regularly requests in such high risk loans to confirm collateral and Plaintiff failed to provide same. Id. at p. 737. The Plaintiff moved for summary judgment based his allegations. Id.

The US District Court for the District of Maryland denied the Plaintiff's motion for summary judgment. Id. It asserted that there was a genuine issue of material fact as to whether the February 27, 1996 letter of adverse action violated Section 1691(d)(1) since it could not be determined conclusively when or "if" the government ever received a completed application. Id. at p. 737 (emphasis added). The Court reasoned that under Regulation B, 12 CFR 202.2 (f), a creditor has wide latitude "...to establish its own application process and to decide the type and amount of information it will require from applicants." Id. at p. 737. The creditor may vary the amount and type of information necessary to "complete" an application depending on the type and amount of the loan. As the Court stated, citing, regulation B, Section 12 CFR 202.2 (f): "'... [a] completed application means an application in connection with which a creditor has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested.' ". Id. at p. 737. The Court went on to state that "'Once a creditor has obtained all the information it normally considers in making a credit decision, the application is complete....'", citing Regulation B, 12 CFR 202.2

(emphasis added). The Court then held specifically that "It is only when the application 'is complete' that the creditor is required to notify the applicant of the credit decision within 30 days." Id. Since there was genuine issue as a matter of law and fact as to whether Mr. Faulkner *ever* completed the application, the Plaintiffs' motion for summary judgment was denied.

Similarly, in Newton et. al v. United Companies Financial Corp., 24 F. Supp. 2d 444; 1998 US Dist. LEXIS 17324, (1998), the United States District Court for the Eastern District of Pennsylvania stated, in interpreting Regulation B, 12 CRF Section 202.2(f) that "...implicit in the Board's definition of 'completed application' is the possibility that a creditor might base credit decisions on different considerations and on different amounts and types of information, depending on the amount and on the type of the credit requested. The commentary further instructs that 'a creditor has the latitude under the regulation to establish its own application process and to decide the type and the amount of information it will require from credit applicants." Id. at p. 458. (emphasis added). (In Newton, the Court determined that the Plaintiff's credit application for a home improvement loan was "complete" under the statute when the applicants submitted the title reports as requested by United.)

In the case at bar, the Plaintiffs claim that the Bank violated the 30 day notice requirement under Section 1691(d) (1). It is expected that Plaintiffs will posit that the Bank was in receipt of a "completed application" within the meaning of that section by mid to late December of 2003. This is simply not the case. As revealed in the Bank's answers to interrogatories, in its replies to requests for production and in the deposition testimony of Michael S. Almeida, Bank President, Nathaniel Baker, and internal

appraiser Leonard Guglielmino, it is the standard and regular practice of the Bank to conduct second appraisals and request governmental permit documentation to ensure collateral for the "type and amount" of loan the Plaintiffs applied for; i.e., a high risk "Second Chance" or "Portfolio" loan. This is especially the case when the amount of the loan unexpectedly increases by a significant amount due to misrepresentations made by applicants during the application process. The Bank, faced with an extra $10,300.00 in the loan amount, coupled with a high risk type of loan, as a matter of course, requested a double check of its collateral on January 8, 2004. It had just received confirmation on January 2, 2004, that the Chapter 13 buyout would require an increase in the loan due to additional and previously undisclosed delinquent mortgage debt. Based on established policy, the Bank made a verbal request to the Plaintiffs to do another site appraisal and requested additional "government agency" documentation in order to compete the application; i.e., the production of building permits. Same were provided to the Bank by Mrs. Sousa on January 8, 2004 by 1:48 pm that day. At that point the Bank had confirmed its collateral was unencumbered by the town and deemed the application to be "completed" at that point. The ensuing letter of adverse action came twenty eight (28) days later on February 5, 2004, within the requirements of the ECOA. Hence based on the language as set forth in Regulation B and rulings in the cases of Faulkner and Newton, Supra, the Bank did not obtain a completed "Second Chance" loan application until it obtained the requisite governmental permits. Since same was provided on January 8, 2004, the adverse action letter, dated February 5, 2004, was sent within a timely manner as set forth in the Act. The Plaintiffs' claim of late notification, thus, has no merit.

**B. Statement of Specific Reasons:**

Subsections (d)(2)(A) and (d)(3) of Section 1691 state that a creditor must provide a written explanation and set forth the "specific reasons" for adverse action on an application for credit. As in the case of the 30 day time requirement under the ECOA, Congress likewise directed the Federal Reserve Board to issue regulations which would define and qualify the "specificity requirement" under subsections (d)(2)(A) and (d)(3) of the Act. See, Higgins, Supra and Payne v. Diner's Club International, 696 F. Supp. 1153; 1988 US Dist. LEXIS 11034 (USDC, S. Dist. of Ohio, Western. Div., 1988). Similarly, these regulations are to be afforded "deference" by the Courts in implementing and interpreting the "specificity" requirements of the Act. Higgins, Supra.

Regulation B, 12 CFR 202.9 (b) (2) of the Board sets forth the applicable and working definition of "specific reasons" to be provided to an applicant of adverse action:

> "Statement of specific reasons. The statement of reasons for adverse action ...must be specific and indicate the principle reasons for the adverse action. Statements that the adverse action was based on the creditors internal standards or policies or that the applicant, joint applicant or similar party failed to achieve a qualifying score on the creditor's credit scoring system are insufficient." (emphasis added).

The purpose of the requirement to provide a "principal reason" for adverse action under the ECOA is to force lenders/creditors to disclose a non-discriminatory reason for credit denial and thus discourage substantive discrimination as set forth in the Act. The second motive is a salutary one with respect to the applicant; i.e.; so the rejected applicant will know what his or her credit problem is and take measures to correct same or to let the applicant know if a creditor relied upon misinformation in denying credit so

that the applicant may have a chance to rectify the mistake. See, Higgins, Supra at p. 733, citing, Senate report No. 94-589, 94th Congress 2nd Session (1976).

Additionally, the Federal Reserve Board, at the request of Congress, compiled a list of reasons for adverse action which would "in most cases" satisfy the "specificity requirement" of the notice provisions of the Act. Higgins, Supra at P. 723. Amongst others, "Delinquent credit obligations" is provided as an example for a "principle reason" for adverse action concerning credit that would comply with the ECOA, when in fact there are delinquencies. Id.

Moreover, the Regulations, as to the "specificity" requirement under the Act, state:

> "In providing reasons for adverse action, creditors need not describe how or why a factor adversely affected an applicant. For example, the notice may say 'length of residence' rather than 'too short a period of residence'" Higgins, Supra citing, 12 CFR Section 202.1101. (emphasis added)

In Higgins, the Plaintiff, Sara Higgins, applied for a J.C. Penny credit card. In a letter the company notified Ms. Higgins that her credit card application had been denied. Id. at p. 722. Ms. Higgins requested additional information as to the reasons for denial and J.C. Penny advised her in a second letter that a major factor (amongst others) in its decision was the Plaintiff's' "delinquent [sic:credit] history." Id. The Plaintiff requested an additional explanation which was never provided. Id. The Plaintiff brought an action alleging that J.C. Penny failed to provide the "specific reasons" for her credit denial as required under the ECOA. She moved for summary judgment and J.C. Penny cross motioned for summary judgment. Id. at p. 724. The Court denied the Plaintiff's motion and granted J.C. Penny's motion for summary judgment. Id

The Court in Higgins stated that a credit report pulled by J.C. Penny showed substantial credit delinquencies and that the explanation given provided to Ms. Higgins was in compliance with the ECOA. Id. at P. 723. The Court further noted that the reason given ("delinquent history") was taken from the suggested list drafted by the Federal Reserve. The Court even suggested, as a matter of law, that a creditor who advises an applicant that a credit application has been denied due to "delinquent credit obligations" complies with the ECOA, if there are in fact delinquencies. Higgins, at p. 32 citing, O'Dowd v. South Cent. Bell 729 F. 2d 347; 1984 US App. LEXIS 23717 (US Ct. App., 5th Cir., 1984). As the Court in Higgins stated, "The… reasons provided to Plaintiff by Penny resemble, in their degree of specificity, those included in the exemplary list of reasons in the Federal Reserve regulations. While Penny's response required some degree of deductive reasoning by the Plaintiff, the Board's interpretive regulation states that this is not impermissible. These regulations represent the Federal Reserve Board's view as to the amount of specificity necessary to comply with the statute." Id. at p. 724. (emphasis added). Thus summary judgment entered for J.C. Penny. Id.

In O'Dowd, Supra, the United States Court of Appeals for the 5th Circuit incorporated the same line of reasoning as in Higgins. Regarding Senate Report No. 589, 94th Cong., 2nd Session, (1976) concerning the notice provision in the ECOA, the Court stated the following:

> "The Senate Report concluded that it was not intended that 'statements of reasons be given in the form of long, detailed personal letters' and that a 'short check-list statement will be sufficient so long as it reasonably indicates the reasons for adverse action.' The report included a sample check-list letter regarded as sufficient…Consonantly with the legislative intent, the administrative regulation promulgated as authorized by the Act provided that the 'statement of reasons for adverse action shall be sufficient if it is specific and indicates the principle reasons' for the action; the regulation furnished a form check-list that if properly completed,

would satisfy the Act's requirements, which includes such short form summaries as **' delinquent credit obligations'** ..." citing, 12 CRF Section 202.9(b) (2). (emphasis added); See also, Payne v. Diner's Club International 696 F. Supp. 1153; 1988 U.S. Dist. LEXIS 11034 (USDC, S. Dist. of Ohio, Western Div., 1988).

In this case the Bank used the "form letter" as drafted by the Federal Reserve Board. On January 2, 2004, the Bank had finally received confirmation from the Plaintiffs' Bankruptcy Attorney as to the amount of the Chapter 13 Debt, which had unexpectedly increased by $10,300.00 due to additional and unexpected delinquent mortgage debt. This increase in total delinquent credit obligations of the Plaintiffs was, in fact, the principle reason, for the adverse credit action taken by the Bank. The Bank, accordingly, checked off column "P" - "Delinquent credit obligations" on the form letter. As stated in the Senate Reports concerning Regulation B, in Higgins, and in O'Dowd, the reasons submitted to the applicant, as a matter of law, should be short and to the point. They need not explain "how or why" a factor, such as the extent of delinquent mortgage/credit obligations, adversely affected an applicant. Based on the above, the Plaintiffs' assertion that the "true reason" for the denial was the "increase of the loan to value ratio" is without merit. While it is true that the increase in delinquent mortgage debt caused the Bank to consider making a second exception to the Bank's normal ceiling of 70 percent for "loan to value" for such high risk "Second Chance" or "Portfolio loans" (i.e., from 73% to 76%), if the Bank had delineated that the high "loan to value" ratio was in fact the reason for denial, it simply would be stating "how" or "why" the ultimate factor affected the application. That is, the delinquent debt increase caused the loan amount to increase thereby causing the "loan to value" ratio to increase to 76 percent. This "explanation" as to "how or why" the delinquent mortgage debt adversely influenced the application is simply not required under the relevant case law or

Regulation B. Moreover, the explanation for denial sought by Plaintiffs (i.e., the high loan to value ratio) is, in fact, a statement of the internal policies and procedures of the Bank with respect to "Second Chance" loans. As referenced above, a statement regarding internal polices and procedures is an "insufficient" explanation for denial. Accordingly, the Plaintiffs' second allegation that the Bank did not provide the actual or "specific reasons" for adverse action on the application is also without merit.

## III. Statement of Probable Length of Trial:

It is reasonable to estimate the length of trial to be approximately five (5) days.

Respectfully submitted,
By attorneys for Defendant,

DOMESTIC BANK,

SHECHTMAN HALPERIN SAVAGE, LLP

*/s/ Steven J. DeLuca*
Steven J. DeLuca, Esquire (#4192)
Gini Spaziano, Esquire (# 5020)
1080 Main Street
Pawtucket, RI 02860
(401) 272-1400 phone
(401) 272-1403 facsimile

Dated: February 26, 2007

**CERTIFICATE OF SERVICE**

***I HEREBY CERTIFY*** that a true and correct copy of the foregoing Memorandum was furnished via electronic mail this 26th day of February 2007 to the following counsel of record:

Christopher M. Lefebvre, Esquire
Joseph E. Marran, III, Esquire
Law Offices of Claude Lefebvre & Sons
P.O. Box 479
Pawtucket, RI 02862

*/s/Steven J. DeLuca*