UNITED STATES DISTRICT COURT
DISTRICT COURT OF RHODE ISLAND

MICHAEL SOUZA and
ELIZABETH SOUZA

VS. C.A. NO. 06-55 ML

DOMESTIC BANK

DEPOSITION OF MICHAEL SOUZA, in the above-entitled cause, taken on behalf of the Defendant, before Jeannette A. Freelove, Notary Public, in and for the State of Rhode Island, at the offices of Shechtman Halperin Savage, LLP, 1080 Main Street, Pawtucket, Rhode Island, on November 8, 2006, at 12:00 p.m.

APPEARANCES:

For the Plaintiffs:
LAW OFFICES OF CLAUDE LEFEBVRE & SONS
BY: JOSEPH E. MARRAN, III, ESQUIRE

For the Defendant:
SHECHTMAN HALPERIN SAVAGE, LLP
BY: STEVEN DELUCA, ESQUIRE

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

INDEX


| WITNESS | PAGE |
|---|---|
| MICHAEL SOUZA | |
| Examination by Mr. DeLuca | 4 |


EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|

No Exhibits offered in this deposition.



(DEPOSITION COMMENCED AT 12:35 P.M.)
MICHAEL SOUZA
Being duly sworn, deposes and testifies as follows:
THE REPORTER: Could you state your full name for the record, please?
THE WITNESS: Michael Souza.
MR. DELUCA: Good afternoon, Mr. Souza. My name is Steve DeLuca. I represent Domestic Bank in this matter. Have you ever been deposed before?
THE WITNESS: No.
MR. DELUCA: We'll try to move this along pretty quickly, so we won't keep you for much more of your day. A deposition is a question and answer session. I'm going to ask you some questions. Your attorney may object to some questions. Notwithstanding the objections, he's preserving the record, so you need to answer a question unless I ask something that your attorney instructs you not to answer. If you have a question about my question, in other words, you don't understand my question, let me know; otherwise, I'll assume you do understand the question, okay?



THE WITNESS: Understood.
MR. DELUCA: If you're not sure about something, don't recall, that's fine. Time has elapsed. People's lives have, you know, gone on, et cetera. Qualify your answer as you see fit; okay?
THE WITNESS: Yes.
MR. DELUCA: You have taken an oath. It's the same oath as if you were in a court of law with a judge and jury, and subject to the penalties of perjury; do you understand that?
THE WITNESS: Yes.
MR. DELUCA: Okay. Do you have any questions at this point?
THE WITNESS: No, I do not.
EXAMINATION BY MR. SOUZA
Q. And it's Michael; right?
A. Correct.
Q. Middle initial?
A. J.
Q. As in John?
A. John is my middle name.
Q. And it's S-O-U-Z-A?
A. Correct.
Q. And what's your date of birth?



A. April 5, 1968.
Q. And where are you employed?
A. Whaling City Iron.
Q. And where is that?
A. 13 Logan Street, New Bedford, Massachusetts.
Q. And during your -- let back up. Did you go to your attorney's office before the deposition to -- without going over specifically what you talked about, but did you meet with Mr. Marran before coming to the deposition?
A. Yes.
Q. And did you prepare for the deposition? Did you look at any documents?
A. He -- just the questions that you had asked that we answered.
Q. Oh, the written questions?
A. Yes.
Q. The Interrogatories?
A. Yes.
Q. Did you discuss with your wife prior to coming here today -- did you two talk about this particular situation with Domestic Bank?
MR. MARRAN: Maybe you can narrow the time frame.
(NO ANSWER)

Q. Well, in the last week, did you talk about it, or last night did you talk about it?
A. No.
Q. So you and your wife never talked about your testimony, what you would say, at the deposition today?
A. I just said no.
Q. Okay. At the time that you received the notice from today's date, you've never talked about what had transpired with Domestic Bank with your wife?
THE WITNESS: What notice from today's date?
Q. You've known about this deposition for some time; correct? Let me ask you this. How long ago do you recall that you received a call from your attorney saying you had to appear at our office to be deposed?
THE WITNESS: Today?
MR. MARRAN: Today?
MR. DELUCA: Yes.
A. I think I found out -- what's today? Today is Wednesday; correct?
MR. DELUCA: Yes.
A. I think I found out Friday.
Q. Okay. And did you discuss from Friday to



Wednesday with your wife about the case?
A. No.
Q. Did you review any documents in preparation for the deposition?
A. No.
Q. Have you ever been charged with any crimes? I don't mean any disrespect, but I usually ask --
A. No.
(OFF THE RECORD)
Q. Have you ever been convicted of any crime?
A. No.
MR. DELUCA: Okay. One more rule. She can't take both us at the same time. That would require having two machines. You may know where I'm going with the question, but let me finish it so that way we can create a record; okay?
THE WITNESS: Okay.
MR. DELUCA: And then, likewise, I'll try not to interrupt you. If I am, let me know. Just say, "May I please complete my answer"; okay?
THE WITNESS: Okay.
MR. DELUCA: It makes it easier for us and for the stenographer.
Q. You have a daughter?



A. Yes.
Q. And she's 12 years old?
A. Yes.
Q. And what's her name?
THE WITNESS: Why is that relevant?
Q. What is her name, sir?
MR. MARRAN: Well --
Q. You have stated in your Answers to Interrogatories that she was living with you at the time of this particular circumstance?
A. Yes.
Q. And your wife has indicated that you and your family underwent some stress.
A. Yes.
Q. Including your daughter.
A. She's 11 years old -- 12 years old, I'm sorry. Turned 12 yesterday. She's a minor. I don't think she needs to be brought up in this.
Q. Well, you've said in Answer to Interrogatory Number 15 -- and I'll tell you why it's relevant.
(PAUSE)
Q. In Number 15, you answer -- read along with me if you could with your counsel, the last paragraph of Answer 15, "The stress that put me and my wife into a constant state of arguments to the point we



did not speak for close to a month. We had to move our daughter, then eight, into a rental home temporarily away from all of her friends, and she did not understand why." So you've said that -- you made reference to your daughter?
A. Yes.
MR. MARRAN: It's marginally relevant. It's relevant to the extent that I think -- well, I'll object.
MR. DELUCA: I'll withdraw the question. Let's move along.
MR. MARRAN: Okay.
Q. Relative to that same Interrogatory -- let's go back a little bit. In May of 2003, you filed Chapter 13; correct?
A. Correct.
Q. And your bankruptcy attorney was Peter Iascone?
A. Correct.
Q. And from May until, let's say, November 1, did you or your wife make any calls to try to get a consolidation loan to pay off the mortgage debt on your house?
A. I did not, no.
Q. Do you know if your wife did?
A. I do not know that.

Page 10

Q. So from May through November, your wife never told you that she was calling any banks to see --
A. I don't recall.
Q. Did your wife ever tell you from May through November that she was calling or had called 10 banks -- roughly 8 to 10 banks regarding getting a consolidation loan to pay off the mortgage debt?
A. I don't recall.
Q. So you don't recall either, she may have had those conversations with you or she may not have; correct?
A. Correct.
Q. Since that time, has she ever discussed with you, since filing suit, that she did, in fact, make calls to other lending institutions to try and pay off the Chapter 13 debt before she got in touch with Domestic or before they contacted each other?
A. Again, I don't recall.
Q. Do you have any documents to show that she or you applied to any lending institutions in that time frame from the filing in May of 2003 to November 1 of 2003?
A. No, I do not have.
Q. Would your bankruptcy attorney, Mr. Iascone, have any application documents relative to any

Page 11

inquiries your wife may have made during that time frame from May of 2003 to November of 2003?
A. Not that I know of.
Q. Basically, who is -- if you had to divvy it up, percentage, who takes care of most of the finances, you or your wife relative to --
A. My wife.
Q. Does she consult with you at all about the matters such as having to file a Chapter 13?
A. When needed, yes.
Q. And do you think she would have consulted with you if she was trying to get, from May to November 1, some type of bank approval for a loan to pay off that debt?
A. Yes.
Q. And you don't recall any conversations about that?
A. No, it was a few years ago, sir.
Q. Okay. Would you agree with me that filing Chapter 13 is a pretty significant event in one's life?
A. Absolutely.
Q. And anything stemming from that would be kind of significant; correct?
A. Correct.
Q. And inability to obtain a loan before November 1 of 2003, do you think that would be something that

Page 12

would stick in your mind, if your wife had told you?
A. Yes.
Q. And your recollection is you don't recall?
A. I don't.
Q. Your testimony is you don't recall?
A. I don't recall. We may have talked about it. I don't recall.
Q. And you personally never made any calls yourself to try and get that?
A. No, I have not.
Q. Do you know what your mortgage debt was at that point when you filed in May 2003?
A. Approximately, but not 100 percent.
Q. What was the approximate figure?
A. I can't pull that off the top of my head.
Q. Well, you said approximately. Can you give me a rough range?
A. Two and change.
Q. 200?
A. Yes, 200 and change.
Q. And you had three mortgages, I guess. Do you remember the mortgage companies?
A. I don't remember all the mortgage companies, no.

Page 13

Q. Just for the record, this is the 98 Greenfield Avenue residence?
A. Correct.
Q. Okay. Do you know how much -- in November of 2003, how much mortgage debt was owed to each of the three -- there was Citi Bank, Conseco and Household Finance. Do you recall how much for each in November 1 -- as of November of 2003? If you don't know, you don't know.
A. No, I do not know.
Q. Okay. Do you know -- are you aware now, as we sit here, that your wife had some type of communication in late November of 2003 with Domestic Bank?
A. Yes.
Q. Do you know how that communication initiated?
A. I believe it was a phone call made to our residence.
Q. And why do you say you believe?
A. Actually, I'm sorry. I do not believe. I know it was a phone call made to our residence.
Q. How do you know?
A. My wife told me so.
Q. Were you on the other line?
A. No, I was not.

Q. Were you present in the house at the time?
A. No, I was not.
Q. Did you speak with -- or did she call you at work and say, "I got someone from Domestic," and talk about the possible application for a loan?
A. Afterwards, after she received the phone call, yes.
Q. But not during the phone call?
A. No.
Q. Do you know if your wife either perused the Yellow Pages or the Internet prior to that to try to get a private loan to pay off the mortgage debt?
A. No.
Q. How much did you pay for the house -- let me ask you this. When did you purchase the house on Greenfield Avenue in Portsmouth?
A. 2000, I think it was. I'm not exactly sure of the year.
Q. So you were in the house for three years?
A. No, then it was before 2000, because I thought we were in the house a little longer than that. I'm not exactly sure of the date.
Q. But before 2000?
A. I believe so.
Q. And do you remember what you paid for the house on



the P and S, purchase and sale?
A. I'm trying to think.
MR. DELUCA: Okay.
A. I believe 105, somewhere around there, between say 100 and $120,000. I'm not 100 percent sure.
Q. Okay. Roughly in that area?
A. Around there.
Q. I'm not going to hold you to the dollar. Roughly in that area?
A. Yes.
Q. It certainly wasn't 250? It certainly wasn't 50,000?
A. No.
Q. So roughly between 100 and 120?
A. Around there.
Q. Okay. Do you know who you purchased it from?
A. It was a builder, a contractor.
Q. What was the contractor's name?
A. I believe Viera was his last name. I'm not 100 percent sure.
Q. Was it a new home or --
A. It was a new home.
Q. And while you were in that home, did you have to file a Chapter 7 or was that before you moved into the home?



A. That was before.
Q. And what was the year that you filed Chapter 7?
A. I don't recall.
Q. So it would be sometime before you purchased that house? And you believe you purchased that house maybe in the late 1990's; would that be fair?
A. Yes.
Q. And the Chapter 7 was sometime before?
A. I believe so.
Q. What would be the year differential between the two?
A. I could not tell you, two years, three years.
Q. Sometime in the mid 1990's, would that be a fair guesstimate as to when you filed Chapter 7?
A. Guesstimate, yes. It could be off.
Q. And you and your wife were married at that point?
A. Yes.
Q. And was your daughter born at that point?
A. Yes.
Q. When you had the Chapter 7 issue, was your daughter born?
A. I believe so.
Q. Did you have any marital problems as a result of that Chapter 7? Did you and your wife get along or --



A. I understood the question.
MR. DELUCA: Okay.
(PAUSE)
MR. MARRAN: Could I have the question read back?
(PENDING QUESTION READ)
MR. MARRAN: I'll object to the form as to what problems mean.
MR. DELUCA: Let me create a little foundation.
Q. Obviously, when you filed Chapter 7 in bankruptcy court, that would create some stress, I would imagine; correct, some family stress? Did it create any stress for you and your wife?
THE WITNESS: Do I have to answer this? To my attorney.
MR. MARRAN: Well --
THE WITNESS: Even though it's an obvious question.
(MR. MARRAN AND THE WITNESS CONFERRING)
Q. Did the Chapter 7 create any stress between you and your wife?
A. Of course.
MR. DELUCA: Being married, I could understand why. Having a house, I can understand

why. Having kids, I can understand why.
Q. Did you have to foreclose on the property -- well, were you -- did you own a home at that time?
A. No, we did not.
Q. So the basis of the Chapter 7 was personal debt?
A. Yes.
Q. Do you recall how much the personal debt was at that time?
A. No.
Q. Was it credit card debt?
A. No.
Q. What was the form of debt?
A. Well, can I re-answer that? It was credit card debt due to medical expenses.
Q. Do you have any idea what the figure was?
A. I'm not sure.
Q. Okay. So you didn't have to go through foreclosure or anything like that?
A. No.
Q. And you got yourself out of it over time?
A. Yes.
Q. Sufficient that you could buy this house on Greenfield?
A. Correct.
Q. Did you and your wife during that period of the



Chapter 7, in or around the mid 1990's, before you moved into the Greenfield house -- did you or she, that you recall, ever see any doctors or get treatment for the stress that it created for you or your wife personally?
A. No.
Q. Who is currently your primary care physician?
A. David Cunningham.
Q. During that period, did you with your wife, during the Chapter 7 in the mid 1990's, ever receive any marital counseling?
A. No.
Q. Did you ever go through a separation during that time frame?
A. No.
Q. Were you or your wife ever treated by Dr. Cunningham or any general physician for the stress?
A. No.
Q. Diagnosed with any medications?
A. No.
Q. Were you -- did your wife have any heart palpations or murmurs during that time frame?
A. Yes.
Q. In the mid 1990's?



A. No, I don't -- strike that. I don't know when she was diagnosed with that, but I remember that once you said that. She has a heart murmur.
Q. So is that --
A. I don't know the time frame of when she was diagnosed that, no.
Q. Initially you had answered yes, and I asked you relative to 1995. So is the answer yes or you don't know?
A. My answer is I don't know.
Q. So she may have or she may not have had a problem going back to the mid 1990's?
A. At that time, she may have had a problem or may not have had a problem, correct.
Q. Who would she have treated with if she had a problem in the 1990's?
A. Her primary care doctor is Dr. Cunningham also.
Q. Do you have his address?
A. He's in Middletown, Rhode Island.
Q. Do you know what street?
A. Aquidneck Avenue. Coastal Medical Services is the name of his place.
Q. So you're not sure what Dr. Cunningham's records would show concerning 1995 relative to you or your wife for treatment?



A. No.
Q. Okay. Did you go -- did that create some stress for you, that situation?
A. Yes.
Q. Were you treated for depression at all during that period?
A. No, I did not.
Q. Have you ever been treated for depression?
A. No.
Q. Either through a psychiatrist or psychologist?
A. No.
Q. From May of '03 to the time you filed the Chapter 13 relative to the Greenfield home --
A. Yes.
Q. -- that was due to three mortgages on the home, outstanding mortgage debt?
MR. MARRAN: I don't understand the question.
(NO ANSWER)
Q. Was the Chapter 13 -- part of the Chapter 13 the mortgage debt you owed on the house?
A. Yes.
Q. Okay. Because of the debt? Is that included in the Chapter 13 petition, the mortgage debt?
A. Yes.

Page 22

Q. From May to November 1 of '03, did you and your wife have marital discord?
THE WITNESS: I'm sorry?
Q. Did you and your wife have any kind of marital discord between May, when you filed Chapter 13, until the end of -- let's say the end of October, beginning of November of '03?
THE WITNESS: What do you mean by "discord"?
Q. Did you have arguments with your wife about your financial situation?
A. After we filed, yes.
Q. How soon after you filed bankruptcy?
A. It was during the whole process. And then it just got to the point, like I said, I wouldn't even speak.
Q. How soon after in May, do you recall, that you began having some marital problems after the filing in May of 2003?
(PAUSE)
Q. I don't want to hold you to a date.
A. I'm trying to think of dates.
(OFF THE RECORD)
A. It was an ongoing thing. When the realization came that it had to be done, it was an ongoing

Page 23

process.
Q. So shortly after the filing, would it be fair to say you began having --
A. Not shortly after. It was before when we contacted our attorney is when it started.
Q. Actually before the filing in May of 2003 --
A. When she told -- I'm sorry.
Q. Actually before you filed in May of 2003, that you began to have problems?
A. When she told me that she had to contact the attorney to do so is when it happened.
Q. Your wife?
A. When my wife told me that she had to contact our attorney to file is when it started, the arguments started.
Q. When did she advise you she had to contact your bankruptcy attorney?
A. I don't recall the date.
Q. So it was sometime before May --
A. Yes.
Q. -- of 2003?
THE WITNESS: I'm sorry. I keep anticipating his question.
Q. And those continued -- how often would you argue? Did they --

Page 24

MR. MARRAN: Over finances, you mean?
MR. DELUCA: Yes.
A. Daily.
Q. And how long would those daily arguments go on to?
A. Sometimes until 4:00 in the morning.
Q. Did you or your wife from May of 2003 to November 1 of 2003 ever separate?
A. No.
Q. Did either one of you ask the other to leave the house for a night or two or for the weekend?
A. No.
Q. Did it ever result in any physical confrontations between you and your wife?
A. Never. Physically?
MR. DELUCA: Uh-huh.
A. Never.
Q. Was there any neighbor that called the police or something like that due to the arguments?
A. Never.
Q. Sometimes they would last until 4:00 in the morning?
A. Yes.
Q. Did they ever distill into other areas other than the financial situation?
A. I can't recall. That was -- financial was the

Page 25

main reason.
Q. During that time frame, did you or your wife ever see -- did you personally experience stress? Obviously, you did; correct?
A. Correct.
Q. Did you get any treatment for it from May to November 1 of 2003?
A. I was actually prescribed Wellbutrin, but I told my doctor it's to quit smoking.
Q. That was Dr. Cunningham?
A. Yes.
Q. You told him that you wanted to quit smoking?
A. Yes.
Q. Are you aware that Wellbutrin is an antidepressant?
A. Yes.
Q. Is that the reason why you took it?
A. Yes.
Q. And you took it commencing when?
A. I don't recall.
Q. Was it before November of 2003?
A. I don't recall.
Q. How soon after the bankruptcy filing did you ask Dr. Cunningham to prescribe Wellbutrin?
A. I believe it was during.

Page 26

Q. During what?
A. During the process.
Q. So it could have been as early as May of 2003 that you got the prescription?
A. Could have been.
Q. Any other medications you asked him to prescribe?
A. No.
Q. How many times did you take Wellbutrin per day?
A. Not many, took a couple; did not like the effect, so I stopped.
Q. Did you get any other medications from May to November 1 from Dr. Cunningham?
A. No.
Q. Did you see any other doctor?
A. No.
Q. Did you have any other symptoms -- physical symptoms from that time frame of the filing until the fall of -- end of October of 2003?
A. Migraines.
Q. Did you take anything for the migraines?
A. Advil.
Q. Any prescription medication?
A. No.
Q. How about your wife during that time frame?
A. I do not know.

Page 27

Q. You didn't talk to each other about your medical situation?
A. Not during this time, no, we did not.
Q. You don't know if she was taking any medications?
A. No.
Q. You don't know if Dr. Cunningham prescribed her any medication from May to the end of October of 2003?
A. No.
Q. Did she ever discuss with you -- do you recall any conversation about how she was feeling during that time frame?
A. That's when she mentioned her heart murmur.
Q. So how soon after the filing do you recall her mentioning the heart murmur?
A. I don't recall how soon after.
Q. Within a month, within weeks?
A. I don't recall.
Q. That summer?
A. I don't recall.
Q. But it was by October of 2003, you recall her saying something about a murmur?
A. I would say yes, but then, again, I don't recall the exact date.
Q. Did she see anybody during either the summer or

Page 28

fall of 2003 for the murmur?
A. I believe she seen Dr. Cunningham.
Q. Did you go with her for any of the visits?
A. No, I did not.
Q. Do you know if she was prescribed any medication?
A. No, I do not.
Q. Now, you say you got to the point where your wife and you did not speak to each other?
A. Correct.
Q. And was that -- what time frame was that? The arguments, obviously, were pretty consistent, you had said?
A. Yes.
Q. At what point did you and your wife stop talking to each other during that May to October of 2003 period?
A. Right after the filing.
Q. So either you weren't talking to each other or you were arguing, was that how it was?
A. Yes, it was.
Q. Okay. During that time frame from May right after the filing until October of 2003?
A. Correct.
Q. And you never sought any marital counseling to kind of help you through that situation?

Page 29

A. No.
Q. Did you either one of you seek any individual counseling to kind of help you through the situation?
A. I did not.
Q. Did your wife?
A. I don't know what my wife did.
Q. Your wife may have or may not have?
A. I do not know.
Q. The house you live in at 56 Sherman Avenue --
A. Correct.
Q. -- do you know when you purchased the house?
A. Around two years ago.
Q. So sometime in '04?
A. Yes.
Q. Do you remember what month you closed on the house?
A. No, I do not. It was towards the end of the summer.
Q. Okay. Do you know what -- how much you purchased the house for pursuant to the purchase and sale?
A. I don't recall, 200 -- between $225,000 to $260,000. I don't recall the exact amount.
Q. It certainly wasn't over $300,000; right?
A. No, it was not.

Page 30

Q. And did you --
A. No, I'm sorry.
Q. We're talking about the house on Sherman?
A. Yes, yes. I can't remember.
Q. You can't remember how much?
A. I cannot remember how much I paid for that house. That's sad, but it's true.
Q. So you can't tell me whether it was in the mid 200's or --
A. Honestly right now, no. I'm drawing a blank.
Q. Do you know what you paid on the note? Do you have a note on the house?
A. Yes.
Q. And who's that through?
A. I believe Washington Mutual.
Q. And who pays the bill on that note?
A. My wife.
Q. Do you know how much you pay per month?
A. No, I do not.
Q. Do you have the closing papers on the purchase of the home?
A. I do not, no.
Q. Does your wife?
A. She should have it.
Q. As you sit here today, you have no idea what you

Page 31

paid for the house?
A. No.
Q. Certainly above 200?
A. Yes.
Q. Was it above 300?
A. Honestly, I can't remember if it was 250 or 350. Between 200 and $400,000. How's that?
Q. Who located the home?
A. My wife.
Q. Who wanted the home?
A. We did.
Q. And did you agree to that price of the home itself, both of you together?
A. Yes.
Q. Now, at some point, you became aware that your wife either was contacted or contacted Domestic Bank relative to a prospective buyout mortgage loan; correct?
A. Yes.
Q. To consolidate those three mortgage debts on your house at Greenfield Avenue?
A. Correct.
Q. And correct me if I'm wrong, but from what I've heard from your wife, she basically is the one who dealt with Domestic; correct?

Page 32

A. Correct.
Q. Now, eventually the loan didn't work out; correct?
A. Correct.
Q. And you ended up having to sell the house on 98 Greenfield Avenue in Portsmouth; right?
A. Correct.
Q. Was that pursuant to a foreclosure sale or was that a private sale?
A. That was a private sale.
Q. Do you recall when -- do you recall getting a notice from the bank on February 5 or thereabouts of 2004 that the loan application was not approved?
THE WITNESS: Do I recall getting the notice?
MR. DELUCA: Yes.
A. No, I do not recall the day. It came in the mail.
Q. Let me ask you this. Do you recall when you sold -- when the Greenfield -- 98 Greenfield Avenue house was sold?
A. No, I do not recall the date.
Q. Do you recall the season, spring, winter?
A. Between summer and fall.
Q. Was it listed?

Page 33

A. Yes.
Q. By whom?
A. Century 21.
Q. And who was your agent?
A. Wendy.
Q. Okay. And where was -- which office of Century 21?
A. I believe it was -- they're out of either Middletown or Newport on Aquidneck Island.
Q. Do you know how much you purchased the home for when you purchased it in the late 1990's? No, you said that. You said between 100 and 105; right?
A. Correct.
Q. You said something like that?
A. Yes.
Q. And is it Wendy Lord Harvey, is that the woman --
A. She sold the home, yes.
Q. Okay. Do you recall how long you had it on the market for?
A. No.
Q. Was it a long period, do you remember, or a short period, or you don't recall?
A. I don't recall.
Q. Do you know what you got for the home? Let me ask you this before you answer that -- yes, do you

Page 34

remember what you got for the home, what the sales price was?
A. No, I do not.
Q. Do you have the closing documents or your wife?
A. My wife should.
Q. Do you know what the house was listed for?
A. No, I do not.
Q. Were you able to pay off the Chapter 13 bankruptcy as a result of the sale?
A. Yes.
Q. So sometime in, you're saying, the summer, you think, fall or thereabouts, that you sold the home?
A. Yes.
Q. How many people looked at the house?
A. I could not tell you that.
Q. How close to the listing price -- do you recall if it came close to it?
A. I believe it came close to it.
Q. Who did the listing, you or your wife?
A. My wife.
Q. Do you know -- from the time that Domestic advised you and your wife that the loan was -- the application wasn't being accepted, do you recall whether your wife or you made any other phone

Page 35

calls to any other banks to try to pay off the mortgage debt?
MR. MARRAN: I'm going to object to the form. That represents that the loan application wouldn't be accepted.
(NO ANSWER)
Q. Well, let me ask you this. There was a letter issued to the bank that we can agree, I think, upon with Mr. Marran dated 2/5/04 that you and your wife got from the bank. There was a letter of some sort. My question is --
MR. MARRAN: I'm not going to assume that that's correct, but you can ask him.
Q. Well, you were advised at some point that the loan -- do you know if the loan application was rejected by the bank?
A. No, we received a letter that it was approved.
Q. That's the December 22 fax to your attorney, Peter Iascone; correct, that you're referring to?
A. Yes.
Q. Okay. But what I'm saying is at some point, did you get another -- some type of communication from the bank that they decided -- they could not or decided not to approve the loan?
A. Yes.

Page 36

Q. After that letter?
A. After that letter, yes.
Q. That was the letter that went to the Bankruptcy Court; correct?
THE WITNESS: Which one?
MR. DELUCA: The one that's addressed to Peter Iascone.
A. I don't know if it's addressed to Peter or to my wife and myself.
MR. DELUCA: Okay. Well, we don't need to mark it as an exhibit for purposes of this deposition, but let me just show you that letter. Maybe that will refresh your memory. During your wife's deposition, we had that letter marked.
(PAUSE)
MR. DELUCA: I don't see it. We might not have.
(OFF THE RECORD)
MR. DELUCA: Okay. I didn't mark it.
Q. If you take a look at that document, is that the December 22 letter that's faxed on December 22?
A. Yes.
Q. Is that the letter you're talking about?
A. Yes.
Q. And it says, "Dear Mr. Iascone"; correct?

Page 37

A. Yes, at the top it says Michael and Elizabeth Souza, 98 Greenfield Ave., and underneath it says Peter Iascone, and then the information.
Q. Okay. Do you remember receiving this document from the bank which was Exhibit J in your wife's deposition, Statement of Credit Denial, Termination or Change?
A. Yes.
Q. That's dated 2/5/04 correct?
A. Yes.
Q. And when you got that, I'm sure you -- did you talk about that with your wife?
A. Yes.
Q. Okay. And do you know if -- after you got that letter from the bank, did you or your wife make any other credit inquiries to other banks to try and pay off the Chapter 13 debt?
A. I did not, no.
Q. You don't know?
A. I did not.
Q. How about your wife?
A. I do not know if my wife did.
Q. So you, yourself, never made any attempts to try and contact banks?
A. No.

Q. You, yourself, had never contacted or spoke with a representative from Domestic?
A. After they contacted us, yes. I did not contact them to apply for a loan, no.
Q. Your wife did the leg work on that?
A. After they contacted her, my wife did the leg work, yes.
Q. Okay. Does your wife still treat for the heart murmur?
A. You'd have to talk to her about that.
Q. You don't know?
A. I do not know.
Q. Do you still treat for migraine headaches?
A. Advil.
Q. So you take Advil for -- you still get migraine headaches?
A. Yes. Not as often, but yes.
Q. Have you and your wife -- do you still have occasional marital discord or arguments?
MR. MARRAN: Regarding finances?
THE WITNESS: Regarding what?
MR. MARRAN: I'll object to the form.
(NO ANSWER)
Q. Have you and your wife ever been to any marital counselor at any point?



A. No.
Q. Other than Dr. Cunningham, did you or your wife treat with any other physician?
A. No.
Q. The house that you live in now --
A. Yes.
Q. -- just from a layout standpoint and square footage standpoint, would you say it's bigger or smaller than the 98 Greenfield Avenue property?
A. Larger.
Q. And like what kind of style home is it?
A. Colonial.
Q. How many garages?
A. None.
Q. How many rooms?
A. Three bedroom, two and a half bathrooms.
Q. Two and one-half bathrooms?
A. Yes.
Q. Living room?
A. Yes.
Q. Playroom?
THE WITNESS: What do you mean by "playroom"?
Q. Do you have a place where your daughter keeps her dolls and stuff like that other than her bedroom?



A. There is a finished basement, yes.
Q. Okay. How many rooms total?
A. Five plus the bathrooms.
Q. Do you know what the current value of the house is on the market?
A. No.
Q. And it's 56 Sherman Avenue?
A. Correct.
Q. In Bristol?
A. Bristol.
Q. What area of Bristol is that?
A. Down by the Kickemuit River.
Q. Kind of near the high school area?
A. Not far from the high school.
Q. Not far. Do you know where Chestnut Street is?
A. I'm not 100 percent sure.
Q. Before you get to the Colt State Park, though; right?
A. It's on the opposite side. It's off of Metacom Ave.
Q. If you're heading south on Metacom Avenue, would it be a left onto Sherman? Is it right off Metacom Avenue or --
A. It's right off Metacom.
Q. And you would take a left to head east?



A. Yes.
Q. How many square feet is the lot?
A. The lot is 20,000, I believe.
Q. Do you know how large the lot was on the Greenfield Avenue property?
A. 5,000.
MR. DELUCA: That's it.
MR. MARRAN: I have no questions. I'll just, again, request a chance to read and sign the transcript.
THE REPORTER: And you would like a copy?
THE WITNESS: Yes.
(DEPOSITION CLOSED AT 1:25 P.M.)

CERTIFICATE

I, Jeannette A. Freelove, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of Michael Souza, Plaintiff, in the above-entitled cause, was taken by me at the offices of Shechtman Halperin Savage, LLP, 1080 Main Street, Pawtucket, Rhode Island, commencing at 12:00 p.m. on November 8, 2006; that previous to the testimony of said witness, who was of lawful age, the witness was sworn by me; whereupon the witness was first duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth; and that the witness thereupon testified as in the foregoing-annexed transcript.

I further certify that the foregoing deposition was taken down by me in stenotype and was later reduced to computer-aided transcription; and the foregoing is a true and accurate record of the testimony of said witness.

Pursuant to Rule 30, the witness, with agreement of the parties, hereby requests the right to read and sign the transcript.

Pursuant to Rule 5(d) and 30(f)(1) of the Federal Rules of Civil Procedure, original transcripts shall be not filed in court. Therefore, original is delivered and retained by Attorney DeLuca.

IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of November, 2006.

________________________________________
JEANNETTE A. FREELOVE, NOTARY PUBLIC
Certified Court Reporter
My Commission expires July 17, 2009

DATE: November 8, 2006
IN RE: Souza v. Domestic Bank
WITNESS NAME: Michael Souza

**A**
able 34:8
above-entitled 1:9 42:4
Absolutely 11:20
accepted 34:24 35:5
accurate 42:12
address 20:18
addressed 36:6,8
administer 42:3
Advil 26:21 38:14,15
advise 23:16
advised 34:22 35:14
afternoon 3:8
age 42:7
agent 33:4
ago 6:14 11:17 29:13
agree 11:18 31:12 35:8
agreement 42:14
ALLIED 1:21
amount 29:23
answer 3:16,19,21 4:5 5:25 7:21 8:19,22,24 17:15 20:8,10 21:19 33:25 35:6 38:23
answered 5:15 20:7
Answers 8:8
anticipating 23:23
antidepressant 25:15
anybody 27:25
appear 6:16
APPEARANCES 1:14
application 10:25 14:5 32:12 34:24 35:5,15
applied 10:20
apply 38:4
approval 11:13
approve 35:24
approved 32:13 35:17
approximate 12:15
approximately 12:14 12:17
April 5:1
Aquidneck 20:21 33:9
area 15:6,9 40:11,13
areas 24:23
argue 23:24
arguing 28:19
arguments 8:25 22:10 23:15 24:4,18 28:11 38:19
asked 5:14 20:7 26:6
assume 3:24 35:12
attempts 37:23
attorney 3:17,20 6:16 9:17 10:24 17:16 23:5 23:11,14,17 35:18 42:17
attorney's 5:7
Ave 37:2 40:20
Avenue 1:22 13:2 14:16 20:21 29:10 31:21 32:5,21 39:9 40:7,21 40:23 41:5
aware 13:11 25:14 31:15

**B**
B 2:11
back 5:6 9:14 17:5 20:12
bank 1:6 3:10 5:22 6:10 11:13 13:6,14 31:17 32:11 35:8,10,16,23 37:5,15 42:24
bankruptcy 9:17 10:24 17:11 22:13 23:17 25:23 34:8 36:3
banks 10:2,6,6 35:1 37:16,24
basement 40:1
basically 11:4 31:24
basis 18:5
bathrooms 39:16,17 40:3
Bedford 5:5
bedroom 39:16,25
began 22:18 23:3,9
beginning 22:7
behalf 1:9
believe 13:17,19,20 14:24 15:4,19 16:5,9 16:22 25:25 28:2 30:15 33:8 34:19 41:3
bigger 39:8
bill 30:16
birth 4:25
bit 9:14
blank 30:10
born 16:18,21
Bristol 40:9,10,11
brought 8:18
builder 15:17
buy 18:22
buyout 31:17

**C**
C 42:1,1
call 6:15 13:17,21 14:3 14:6,8
called 10:5 24:17
calling 10:2,5
calls 9:20 10:15 12:9 35:1
card 18:10,13
care 11:5 19:7 20:17
case 7:1
cause 1:9 42:5
cautioned 42:8
Century 33:3,6
certainly 15:11,11 29:24 31:3
Certified 42:22
certify 42:4,10
cetera 4:5
chance 41:9
change 12:19,21 37:7
Chapter 9:15 10:16 11:9,18 15:24 16:2,8 16:14,20,24 17:11,21 18:5 19:1,10 21:12,20 21:20,24 22:5 34:8 37:17
charged 7:6
Chestnut 40:15
circumstance 8:10
Citi 13:6
City 5:3
Civil 42:16
CLAUDE 1:16
close 9:1 34:17,18,19
closed 29:16 41:14
closing 30:20 34:4
Coastal 20:21
Colonial 39:12
Colt 40:17
coming 5:10,20
COMMENCED 3:1
commencing 25:19 42:6
Commission 42:22
commissioned 42:3
communication 13:13 13:16 35:22
companies 12:23,24
complete 7:21
computer-aided 42:11
concerning 20:24
CONFERRING 17:20
confrontations 24:12
Conseco 13:6
consistent 28:11
consolidate 31:20
consolidation 9:21 10:7
constant 8:25
consult 11:8
consulted 11:11
contact 23:10,13,16 37:24 38:4
contacted 10:17 23:5 31:16,16 38:1,3,6
continued 23:24
contractor 15:17
contractor's 15:18
conversation 27:11
conversations 10:10 11:16
convicted 7:10
copy 41:12
correct 4:18,24 6:14,22 9:15,16,18 10:11,12 11:22,23 13:3 17:13 18:24 20:14 25:4,5 28:9,23 29:11 31:18 31:22,23,25 32:1,2,3 32:6 33:13 35:13,19 36:4,25 37:9 40:8
counsel 8:23
counseling 19:11 28:24 29:3
counselor 38:25
couple 26:9
course 17:23
court 1:1,1,21 4:9 17:12 36:4 42:16,22
CRANSTON 1:22
create 7:16 17:9,12,14 17:21 21:2
created 19:4
credit 18:10,13 37:6,16
crime 7:10
crimes 7:6
Cunningham 19:8,17 20:17 25:10,24 26:12 27:6 28:2 39:2
Cunningham's 20:23
current 40:4
currently 19:7
C.A 1:5

**D**
D 2:1
daily 24:3,4
date 4:25 6:9,12 14:22 22:21 23:18 27:24 32:22 42:23
dated 35:9 37:9
dates 22:22
daughter 7:25 8:15 9:2 9:5 16:18,21 39:24
David 19:8
day 3:15 26:8 32:17 42:19
dealt 31:25
Dear 36:25
debt 9:21 10:7,16 11:14 12:12 13:5 14:12 18:5 18:7,10,12,14 21:16 21:21,23,24 35:2 37:17
debts 31:20
December 35:18 36:21 36:21
decided 35:23,24
Defendant 1:10,17
delivered 42:17
DeLuca 1:18 2:5 3:8,9 3:13 4:2,8,13 6:20,23 7:12,19,23 9:10 15:3 17:2,9,24 24:2,15 32:16 36:6,10,16,19 41:7 42:17
Denial 37:6
deposed 3:11 6:17
deposes 3:3
deposition 1:9 2:14 3:1 3:15 5:7,10,12 6:5,13 7:4 36:12,14 37:6 41:14 42:4,11
depression 21:5,8
DESCRIPTION 2:12
diagnosed 19:20 20:2,6
differential 16:10
discord 22:2,5,9 38:19
discuss 5:20 6:25 27:10
discussed 10:13
disrespect 7:7
distill 24:23
DISTRICT 1:1,1
divvy 11:4
doctor 20:17 25:9 26:14
doctors 19:3
document 36:20 37:4
documents 5:13 7:3 10:19,25 34:4
dollar 15:8
dolls 39:25
Domestic 1:6 3:10 5:22 6:10 10:17 13:14 14:4 31:16,25 34:22 38:2 42:24
Dr 19:17 20:17,23 25:10,24 26:12 27:6 28:2 39:2
drawing 30:10
due 18:14 21:15 24:18
duly 3:3 42:3,7

**E**
E 1:16 2:1,11 42:1,1
early 26:3
easier 7:23
east 40:25
effect 26:10
eight 9:2
either 10:9 14:10 21:10 24:9 27:25 28:18 29:2 31:16 33:8
elapsed 4:4
Elizabeth 1:4 37:1

**employed** 5:2
**ended** 32:4
**ESQUIRE** 1:16,18
**et** 4:5
**event** 11:19
**eventually** 32:2
**exact** 27:24 29:23
**exactly** 14:17,22
**Examination** 2:5 4:16
**exhibit** 36:11 37:5
**Exhibits** 2:14
**expenses** 18:14
**experience** 25:3
**expires** 42:22
**extent** 9:8

F

**F** 42:1
**fact** 10:14
**fair** 16:6,13 23:2
**fall** 26:18 28:1 32:24 34:12
**family** 8:13 17:13
**far** 40:14,15
**fax** 35:18
**faxed** 36:21
**February** 32:11
**Federal** 42:16
**feeling** 27:11
**feet** 41:2
**figure** 12:15 18:15
**file** 11:9 15:24 23:14
**filed** 9:14 12:13 16:2,14 17:11 21:12 22:5,12 22:13 23:8 42:16
**filing** 10:14,21 11:18 22:19 23:2,6 25:23 26:17 27:14 28:17,22
**Finance** 13:7
**finances** 11:6 24:1 38:20
**financial** 22:11 24:24 24:25
**fine** 4:3
**finish** 7:16
**finished** 40:1
**first** 42:7
**fit** 4:5
**Five** 40:3
**follows** 3:4
**footage** 39:8
**foreclose** 18:2
**foreclosure** 18:18 32:7
**foregoing** 42:4,10,12
**foregoing-annexed** 42:9
**form** 17:7 18:12 35:4 38:22
**found** 6:21,24
**foundation** 17:10
**frame** 5:24 10:21 11:2 19:14,23 20:5 25:2 26:17,24 27:12 28:10 28:21
**Freelove** 1:10 42:2,21
**Friday** 6:24,25
**friends** 9:3
**full** 3:6
**further** 42:10

G

**garages** 39:13
**general** 19:17
**getting** 10:6 32:10,14
**give** 12:17
**go** 5:6 9:13 18:17 19:13 21:2 24:4 28:3
**going** 3:16 5:8 7:15 15:8 20:12 35:3,12
**Good** 3:8
**Greenfield** 13:1 14:16 18:23 19:2 21:13 31:21 32:5,20,20 37:2 39:9 41:5
**guess** 12:22
**guesstimate** 16:14,15

H

**H** 2:11
**half** 39:16
**Halperin** 1:11,18 42:5
**hand** 42:19
**happened** 23:11
**Harvey** 33:16
**head** 12:16 40:25
**headaches** 38:13,16
**heading** 40:21
**heard** 31:24
**heart** 19:22 20:3 27:13 27:15 38:8
**help** 28:25 29:3
**hereunto** 42:18
**high** 40:13,14
**hold** 15:8 22:21
**home** 9:2 15:21,22,23 15:25 18:3 21:13,15 30:21 31:8,10,12 33:10,17,24 34:1,13 39:11
**Honestly** 30:10 31:6
**house** 9:22 14:1,14,15 14:19,21,25 16:5,5 17:25 18:22 19:2 21:21 24:10 29:10,12 29:17,21 30:3,7,12 31:1,21 32:4,21 34:6 34:15 39:5 40:4
**Household** 13:7
**How's** 31:7

I

**Iascone** 9:17 10:24 35:19 36:7,25 37:3
**idea** 18:15 30:25
**III** 1:16
**imagine** 17:13
**inability** 11:24
**included** 21:23
**Including** 8:15
**indicated** 8:12
**individual** 29:2
**information** 37:3
**initial** 4:19
**Initially** 20:7
**initiated** 13:16
**inquiries** 11:1 37:16
**institutions** 10:15,20
**instructs** 3:21
**Internet** 14:11
**Interrogatories** 5:18 8:8
**Interrogatory** 8:19 9:13
**interrupt** 7:20
**Iron** 5:3
**Island** 1:1,10,11 20:19 33:9 42:3,6
**issue** 16:20
**issued** 35:8

J

**J** 4:20 37:5
**Jeannette** 1:10 42:2,21
**John** 4:21,22
**JOSEPH** 1:16
**judge** 4:10
**July** 42:22
**jury** 4:10

K

**keep** 3:14 23:22
**keeps** 39:24
**Kickemuit** 40:12
**kids** 18:1
**kind** 11:21 22:4 28:25 29:3 39:11 40:13
**know** 3:23 4:4 7:14,20 9:24,25 11:3 12:12 13:4,9,9,10,11,16,20 13:22 14:10 15:16 20:1,5,9,10,20 26:25 27:4,6 28:5 29:7,9,12 29:20 30:11,18 33:10 33:24 34:6,22 35:15 36:8 37:14,19,22 38:11,12 40:4,15 41:4
**known** 6:13

L

**large** 41:4
**Larger** 39:10
**late** 13:13 16:6 33:11
**law** 1:16 4:10
**lawful** 42:7
**layout** 39:7
**leave** 24:9
**LEFEBVRE** 1:16
**left** 40:22,25
**leg** 38:5,6
**lending** 10:15,20
**letter** 35:7,10,17 36:1,2 36:3,12,14,21,23 37:15
**let's** 9:11,13,19 22:6
**life** 11:19
**likewise** 7:19
**line** 13:24
**listed** 32:25 34:6
**listing** 34:17,20
**little** 9:14 14:21 17:9
**live** 29:10 39:5
**lives** 4:4
**living** 8:9 39:19
**LLP** 1:11,18 42:5
**loan** 9:21 10:7 11:13,24 14:5,12 31:18 32:2,12 34:23 35:4,15,15,24 38:4
**located** 31:8
**Logan** 5:5
**long** 6:14 24:4 33:18,21
**longer** 14:21
**look** 5:13 36:20
**looked** 34:15
**Lord** 33:16
**lot** 41:2,3,4

M

**machines** 7:14
**mail** 32:18
**main** 1:11 25:1 42:5
**marginally** 9:7
**marital** 16:23 19:11 22:2,4,18 28:24 38:19 38:24
**mark** 36:11,19
**marked** 36:14
**market** 33:19 40:5
**Marran** 1:16 5:9,23 6:19 8:7 9:7,12 17:4,7 17:17,20 21:17 24:1 35:3,9,12 38:20,22 41:8
**married** 16:16 17:24
**Massachusetts** 5:5
**matter** 3:10
**matters** 11:8
**mean** 7:7 17:8 22:8 24:1 39:22
**medical** 18:14 20:21 27:1
**medication** 26:22 27:7 28:5
**medications** 19:20 26:6 26:11 27:4
**meet** 5:9
**memory** 36:13
**mentioned** 27:13
**mentioning** 27:15
**Metacom** 40:19,21,23 40:24
**Michael** 1:4,9 2:4 3:2,7 4:17 37:1 42:4,24
**mid** 16:13 19:1,10,25 20:12 30:8
**middle** 4:19,22
**Middletown** 20:19 33:9
**migraine** 38:13,15
**migraines** 26:19,20
**mind** 12:1
**minor** 8:17
**ML** 1:5
**month** 9:1 27:17 29:16 30:18
**morning** 24:5,21
**mortgage** 9:21 10:7 12:12,23,24 13:5 14:12 21:16,21,24 31:17,20 35:2
**mortgages** 12:22 21:15
**move** 3:13 9:2,11
**moved** 15:24 19:2
**murmur** 20:3 27:13,15 27:22 28:1 38:9
**murmurs** 19:23
**Mutual** 30:15

N

**N** 2:1
**name** 3:6,9 4:22 8:4,6 15:18,19 20:22 42:24
**narrow** 5:23
**near** 40:13
**need** 3:19 36:11
**needed** 11:10
**needs** 8:18
**neighbor** 24:17
**never** 6:4,9 10:1 12:9 24:14,16,19 28:24 37:23 38:1

new 5:5 15:21,22
Newport 33:9
night 6:2 24:10
Notary 1:10 42:2,21
note 30:11,12,16
notice 6:8,11 32:11,15
Notwithstanding 3:18
November 1:12 9:19 10:1,5,21 11:2,12,24 13:4,8,8,13 22:1,7 24:7 25:7,21 26:12 42:6,19,23
Number 8:20,22

**O**

oath 4:8,9
oaths 42:3
object 3:17 9:9 17:7 35:3 38:22
objections 3:18
obtain 11:24
obvious 17:19
obviously 17:11 25:4 28:11
occasional 38:19
October 22:6 26:18 27:7,21 28:15,22
offered 2:14
office 5:7 6:16 33:6
offices 1:11,16 42:5
Oh 5:16
okay 3:25 4:6,13 6:8,25 7:12,17,18,21,22 9:12 11:18 13:4,11 15:3,6 15:16 17:2 18:17 21:2 21:23 28:21 29:20 33:6,18 35:21 36:10 36:19 37:4,14 38:8 40:2
old 8:2,16,16
once 20:3
one's 11:19
one-half 39:17
ongoing 22:24,25
opposite 40:19
original 42:16,17
outstanding 21:16
owed 13:5 21:21

**P**

P 15:1
PAGE 2:2,12
Pages 14:11
paid 14:25 30:6,11 31:1
palpations 19:23
papers 30:20
paragraph 8:23
Park 40:17
part 21:20
particular 5:22 8:10
parties 42:14
PAUSE 8:21 17:3 22:20 36:15
Pawtucket 1:11 42:5
pay 9:21 10:7,15 11:13 14:12,14 30:18 34:8 35:1 37:17
pays 30:16
penalties 4:11
PENDING 17:6
people 34:15
People's 4:4
percent 12:14 15:5,20 40:16
percentage 11:5
period 18:25 19:9 21:6 28:16 33:21,22
perjury 4:11
personal 18:5,7
personally 12:9 19:5 25:3
perused 14:10
Peter 9:17 35:18 36:7,8 37:3
petition 21:24
PHENIX 1:22
phone 13:17,21 14:6,8 34:25
physical 24:12 26:16
Physically 24:14
physician 19:7,17 39:3
place 20:22 39:24
Plaintiff 42:4
Plaintiffs 1:15
playroom 39:21,23
please 3:6 7:21
plus 40:3
point 4:14 8:25 12:13 16:16,18 22:15 28:7 28:14 31:15 35:14,21 38:25
police 24:17
Portsmouth 14:16 32:5
possible 14:5
preparation 7:3
prepare 5:12
prescribe 25:24 26:6
prescribed 25:8 27:6 28:5
prescription 26:4,22
present 14:1
preserving 3:19
pretty 3:14 11:19 28:11
previous 42:6
price 31:12 34:2,17
primary 19:7 20:17
prior 5:20 14:11
private 14:12 32:8,9
problem 20:11,13,14 20:16
problems 16:23 17:8 22:18 23:9
Procedure 42:16
process 22:14 23:1 26:2
property 18:2 39:9 41:5
prospective 31:17
psychiatrist 21:10
psychologist 21:10
Public 1:10 42:2,21
pull 12:16
purchase 14:15 15:1 29:21 30:20
purchased 15:16 16:4,5 29:12,20 33:10,11
purposes 36:11
pursuant 29:21 32:7 42:13,15
put 8:24
p.m 1:12 3:1 41:14 42:6

**Q**

qualified 42:3
Qualify 4:5
question 3:15,20,22,22 3:23,25 7:15 9:11 17:1,5,6,19 21:18 23:23 35:11
questions 3:17,18 4:14 5:14,16 41:8
quickly 3:14
quit 25:9,12

**R**

R 42:1
range 12:18
read 8:22 17:5,6 41:9 42:14
realization 22:24
reason 25:1,17
recall 4:3 6:15 10:3,8,9 10:18 11:16 12:4,6,7 12:8 13:7 16:3 18:7 19:3 22:17 23:18 24:25 25:20,22 27:10 27:14,16,18,20,21,24 29:22,23 32:10,10,14 32:17,19,22,23 33:18 33:22,23 34:17,24
receive 19:10
received 6:8,15 14:6 35:17
receiving 37:4
recollection 12:4
record 3:6,19 7:9,16 13:1 22:23 36:18 42:12
records 20:23
reduced 42:11
reference 9:5
referring 35:19
refresh 36:13
regarding 10:6 38:20 38:21
rejected 35:16
relative 9:13 10:25 11:6 20:8,24 21:13 31:17
relevant 8:5,20 9:8,8
remember 12:23,24 14:25 20:2 29:16 30:4 30:5,6 31:6 33:21 34:1 37:4
rental 9:2
Reporter 3:5 41:11 42:22
REPORTERS 1:21
represent 3:9
representative 38:2
represents 35:4
request 41:9
requests 42:14
require 7:14
residence 13:2,18,21
result 16:23 24:12 34:9
retained 42:17
review 7:3
re-answer 18:13
Rhode 1:1,10,11 20:19 42:3,6
right 4:17 28:17,21 29:24 30:10 32:5 33:12 40:18,22,24 42:14
River 40:12
room 39:19
rooms 39:15 40:2
rough 12:18
roughly 10:6 15:6,8,14
rule 7:12 42:13,15
Rules 42:16
R.I 1:22

**S**

S 2:11 15:1
sad 30:7
sale 15:1 29:21 32:7,8,9 34:9
sales 34:1
Savage 1:11,18 42:5
saying 6:16 27:22 34:11 35:21
says 36:25 37:1,2
school 40:13,14
season 32:23
see 4:5 10:2 19:3 25:3 26:14 27:25 36:16
seek 29:2
seen 28:2
sell 32:4
separate 24:7
separation 19:13
Services 20:21
session 3:16
set 42:18
Shechtman 1:11,18 42:5
Sherman 29:10 30:3 40:7,22
short 33:21
shortly 23:2,4
show 10:19 20:24 36:12
side 40:19
sign 41:10 42:14
significant 11:19,22
sir 8:6 11:17
sit 13:11 30:25
situation 5:22 21:3 22:11 24:24 27:2 28:25 29:4
smaller 39:9
smoking 25:9,12
sold 32:20,21 33:17 34:12
SONS 1:16
soon 22:13,17 25:23 27:14,16
sorry 8:16 13:20 22:3 23:7,22 30:2
sort 35:11
sought 28:24
south 40:21
Souza 1:4,4,9 2:4 3:2,7 3:9 4:16 37:2 42:4,24 42:24
speak 9:1 14:3 22:16 28:8
specifically 5:8
spoke 38:1
spring 32:23
square 39:7 41:2
standpoint 39:7,8
started 23:5,14,15
state 1:10 3:5 8:25 40:17 42:3
stated 8:8
Statement 37:6
STATES 1:1
stemming 11:21
stenographer 7:24
stenotype 42:11
Steve 3:9

**STEVEN** 1:18
**stick** 12:1
**stop** 28:14
**stopped** 26:10
**street** 1:11 5:5 20:20 40:15 42:5
**stress** 8:13,24 17:12,13 17:14,21 19:4,18 21:2 25:3
**strike** 20:1
**stuff** 39:25
**style** 39:11
**subject** 4:10
**Sufficient** 18:22
**suit** 10:14
**summer** 27:19,25 29:19 32:24 34:11
**sure** 4:2 14:17,22 15:5 15:20 18:16 20:23 37:11 40:16
**sworn** 3:3 42:7,8
**symptoms** 26:16,17
**S-O-U-Z-A** 4:23

**T**

**T** 2:11 42:1,1
**take** 7:13 26:8,20 36:20 38:15 40:25
**taken** 1:9 4:8 42:5,11
**takes** 11:5
**talk** 5:21 6:1,2 14:4 27:1 37:12 38:10
**talked** 5:8 6:4,9 12:7
**talking** 28:14,18 30:3 36:23
**tell** 8:20 10:4 16:12 30:8 34:16
**temporarily** 9:3
**Termination** 37:7
**testified** 42:9
**testifies** 3:3
**testify** 42:8
**testimony** 6:5 12:6 42:6 42:12
**thereabouts** 32:11 34:12
**thing** 22:24
**think** 6:21,24 8:18 9:9 11:11,25 14:17 15:2 22:22 34:12 35:8
**thought** 14:20
**three** 12:22 13:6 14:19 16:12 21:15 31:20 39:16
**time** 4:3 5:24 6:8,13 7:13 8:9 10:13,20 11:1 14:1 18:3,8,20 19:14,23 20:5,13 21:12 25:2 26:17,24 27:3,12 28:10,21 34:22
**times** 26:8
**today** 5:21 6:6,18,19,21 6:21 30:25
**today's** 6:9,12
**told** 10:1 12:1 13:23 23:7,10,13 25:9,12
**top** 12:16 37:1
**total** 40:2
**touch** 10:16
**transcript** 41:10 42:9 42:14
**transcription** 42:11
**transcripts** 42:16
**transpired** 6:10
**treat** 38:8,13 39:3
**treated** 19:16 20:15 21:5,8
**treatment** 19:4 20:25 25:6
**true** 30:7 42:12
**truth** 42:8,8,8
**try** 3:13 7:20 9:20 10:15 12:10 14:11 35:1 37:16,23
**trying** 11:12 15:2 22:22
**Turned** 8:17
**two** 5:21 7:14 12:19 16:11,12 24:10 29:13 39:16,17
**type** 11:13 13:12 35:22

**U**

**Uh-huh** 24:15
**underneath** 37:2
**understand** 3:23,24 4:11 9:4 17:25,25 18:1 21:17
**understood** 4:1 17:1
**underwent** 8:13
**UNITED** 1:1
**usually** 7:7

**V**

**v** 42:24
**value** 40:4
**Viera** 15:19
**visits** 28:3
**VS** 1:5

**W**

**want** 22:21
**wanted** 25:12 31:10
**Washington** 30:15
**wasn't** 15:11,11 29:24 34:24
**way** 7:16
**Wednesday** 6:22 7:1
**week** 6:1
**weekend** 24:10
**weeks** 27:17
**Wellbutrin** 25:8,14,24 26:8
**Wendy** 33:5,16
**went** 36:3
**weren't** 28:18
**We'll** 3:13
**We're** 30:3
**Whaling** 5:3
**WHEREOF** 42:18
**wife** 5:20 6:4,10 7:1 8:12,24 9:20,24 10:1 10:4 11:1,6,7 12:1 13:12,23 14:10 16:16 16:24 17:14,22 18:25 19:5,9,16,22 20:25 22:2,4,10 23:12,13 24:6,13 25:2 26:24 28:7,14 29:6,7,8 30:17,23 31:9,16,24 34:4,5,20,21,23,25 35:10 36:9 37:12,15 37:21,22 38:5,6,8,18 38:24 39:2
**wife's** 36:14 37:5
**winter** 32:23
**withdraw** 9:10
**witness** 2:2 3:7,12 4:1,7 4:12,15 6:11,18 7:18 7:22 8:5 17:15,18,20 22:3,8 23:22 32:14 36:5 38:21 39:22 41:13 42:7,7,7,9,12 42:13,18,24
**woman** 33:16
**words** 3:22
**work** 14:3 32:2 38:5,7
**wouldn't** 22:15 35:5
**written** 5:16
**wrong** 31:23

**X**

**X** 2:1,11

**Y**

**year** 14:18 16:2,10
**years** 8:2,16,16 11:17 14:19 16:12,12 29:13
**Yellow** 14:10
**yesterday** 8:17

**$**

**$120,000** 15:5
**$225,000** 29:22
**$260,000** 29:23
**$300,000** 29:24
**$400,000** 31:7

**0**

**02920** 1:22
**03** 21:12 22:1,7
**04** 29:14
**06-55** 1:5

**1**

**1** 9:19 10:21 11:12,24 13:8 22:1 24:7 25:7 26:12
**1:25** 41:14
**10** 10:5,6
**100** 12:14 15:5,5,14,19 33:12 40:16
**105** 15:4 33:12
**1080** 1:11 42:5
**11** 8:16
**115** 1:22
**12** 8:2,16,17
**12:00** 1:12 42:6
**12:35** 3:1
**120** 15:14
**13** 5:5 9:15 10:16 11:9 11:19 21:13,20,20,24 22:5 34:8 37:17
**15** 8:20,22,24
**17** 42:22
**1968** 5:1
**1990's** 16:6,13 19:1,10 19:25 20:12,16 33:11
**1995** 20:8,24

**2**

**2/5/04** 35:9 37:9
**20,000** 41:3
**200** 12:20,21 29:22 31:3,7
**200's** 30:9
**2000** 14:17,20,23
**2003** 9:14 10:21,22 11:2,2,25 12:13 13:5 13:8,13 22:19 23:6,8 23:21 24:6,7 25:7,21 26:3,18 27:8,21 28:1 28:15,22
**2004** 32:12
**2006** 1:12 42:6,19,23
**2009** 42:22
**21** 33:3,7
**22** 35:18 36:21,21
**24th** 42:19
**250** 15:11 31:6

**3**

**30** 42:13
**30(f)(1)** 42:15
**300** 31:5
**350** 31:7

**4**

**4** 2:5
**4:00** 24:5,20
**401** 1:23

**5**

**5** 5:1 32:11
**5(d)** 42:15
**5,000** 41:6
**50,000** 15:12
**56** 29:10 40:7

**7**

**7** 15:24 16:2,8,14,20,24 17:11,21 18:5 19:1,10

**8**

**8** 1:12 10:6 42:6,23

**9**

**946-5500** 1:23
**98** 13:1 32:4,20 37:2 39:9