UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MICHAEL SOUZA and
ELIZABETH SOUZA

VS. C.A. NO. 06-55 ML

DOMESTIC BANK

DEPOSITION OF ELIZABETH SOUZA, in the above-entitled cause, taken on behalf of the Defendant, before Jeannette A. Freelove, Notary Public, in and for the State of Rhode Island, at the offices of Shechtman Halperin Savage, LLP, 1080 Main Street, Providence, Rhode Island, on November 8, 2006, at 10:00 a.m.

APPEARANCES:

For the Plaintiff:
LAW OFFICES OF CLAUDE LEFEBVRE & SONS
BY: JOSEPH E. MARRAN, III, ESQUIRE

For the Defendant:
SHECHTMAN HALPERIN SAVAGE, LLP
BY: STEVEN DELUCA, ESQUIRE
GINI SPAZIANO, ESQUIRE

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

Page 2

INDEX


| WITNESS | PAGE |
|---|---|
| ELIZABETH SOUZA | |
| Examination by Mr. DeLuca | 3 |


EXHIBITS


| DEFENDANT'S NO. | DESCRIPTION | PAGE |
|---|---|---|
| A | Document entitled Uniform Residential Loan Application, 4 pp | 22 |
| B | Document entitled Information Disclosure Authorization dated 12/18/03, 1 p | 28 |
| C | Document entitled Loan Summary dated 11/26/03, 1 p | 30 |
| D | Fax transmittal dated 12/16/03, 2 pp | 34 |
| E | Document entitled Commitment/Residential Mortgage Loan, 2 pp | 42 |
| F | Document entitled Required Document, 1 p | 46 |
| G | Document entitled Loan Processing Checklist, 1 p | 46 |
| H | Handwritten document to Dorothy from Liz Souza and copies of Building Permit Applications dated 2/9/98 and 4/22/99, 3 pp | 52 |
| I | Document entitled Trustee's Report of Receipts, 2 pp | 57 |
| J | Document entitled Domestic Bank Statement of Credit Denial, Termination or Change, 1 pp | 59 |


Page 3

(DEPOSITION COMMENCED 10:20 A.M.)

ELIZABETH SOUZA

Being duly sworn, deposes and testifies as follows:

THE REPORTER: Could you state your full name for the record, please, and spell your last name?

THE WITNESS: Elizabeth Souza, S-O-U-Z-A.

MR. DELUCA: Good morning, Mrs. Souza. My name is Steve DeLuca. I represent Domestic Bank in this matter. We're here on Case Number -- Civil Action Number, US District Court, 06-55 ML, Elizabeth Souza and Michael Souza v. Domestic Bank.

EXAMINATION BY MR. DELUCA

Q. You're here for a deposition. Do you understand that?
A. Yes, I do.
Q. And just briefly, we talked on the phone this morning. You got lost in Downtown Pawtucket?
A. Yes, I did.
Q. Okay. And I kind of gave you directions how to get back here.
A. Yes.

Page 4

Q. Were they okay?
A. They're okay.
Q. All right. We didn't talk about the case at all on the phone, did we?
A. No, we did not.
Q. Can you state your date of birth?
A. 2/14/63.
Q. And your husband, is it Michael John Souza?
A. Yes, it is.
Q. And what's his date of birth?
A. 4/5/68.
Q. And just some rules of the road, so to speak. Have you ever been deposed before?
A. No.

MR. DELUCA: Okay. It's a question and answer kind of session. I'm going to ask you questions. Your attorney may object to some of them. He may not. Unless he instructs you not to answer, you have to answer the question even if he objects to it. He's just protecting the record. You've taken an oath that's the same oath you would take in a court of law, so what you testify to is subject to the penalties of perjury. I just want you to understand that.

THE WITNESS: I do.

Page 5

MR. DELUCA: And if you don't understand a question, please let me know. I want to make sure you understand the question, so your reply is responsive to my question; okay? If you need a break at any point, you let me know. If you need another cup of water, need to use the women's room, we'll try to make this as painless as possible; okay?

THE WITNESS: Okay.

MR. DELUCA: Do you have any questions at this point?

THE WITNESS: I don't.

Q. Okay. Where do you currently reside, Mrs. Souza?
A. 56 Sherman Avenue in Bristol.
Q. And do you -- is that an apartment or a home?
A. No, it's a home.
Q. And do you own the home?
A. Yes, we do.
Q. With your husband?
A. Yes, I do.
Q. When did you purchase that home?
A. 19 -- I'm sorry, 2004.
Q. Do you know the month you closed on the property?
A. August.
Q. August of '04?

Page 6

A. Yes.
Q. Is it a single family house?
A. Yes, it is.
Q. And who resides at the house?
A. Myself, my husband and my daughter.
Q. And what's your daughter's name?
A. Jessica.
Q. How old is she?
A. She's 12.
Q. Any other children?
A. No.
Q. Okay. And where do you work?
A. I work for Smart Staffing Services.
Q. And that's in Foxboro?
A. Yes, it is.
Q. Any other employment?
A. No.
Q. And how long have you been working there?
A. I've been with them on and off for about seven years.
Q. And are you currently a holder of a mortgage for that property?
A. Yes.
Q. Okay. And who's the lender?
A. Washington Mutual.

Page 7

Q. How much is the mortgage, approximately?
A. 330, I believe.
Q. $330,000?
A. Yes.
Q. What was the purchase and sale price of the home?
A. I think it was 330, and then they included some closing costs or something.
Q. And who was the prior owner of the home?
THE WITNESS: Who was the prior owner?
Q. Uh-huh. Who did you buy it from?
A. I don't remember her name.
Q. So you mortgaged the entire purchase price?
A. Yes, we put a down payment because we sold our property.
Q. How much was the down payment?
A. I'm going to say, gosh --
Q. Approximately?
A. $35,000, maybe.
MR. DELUCA: Another rule, again, I don't want you -- if you don't remember something, that's fine. You just let me know you don't remember. Or if you can't recall or if you need to qualify your answer, say, "I think" or "I believe" or "approximately," that's fine; okay?

Page 8

THE WITNESS: Okay.
MR. DELUCA: I don't want you to --
THE WITNESS: I'm guessing on the figures.
MR. DELUCA: That's fine.
Q. Roughly around $35,000?
A. Around, somewhere.
Q. And how much is the monthly mortgage on that house?
A. $2,100, I believe.
Q. And where does your husband work?
A. He works for Whaling City Iron.
Q. And what does he do there?
A. He does purchasing and sales.
Q. Now, from early -- late 2003, early 2004, have your jobs changed with you and your husband? He used to work for Capco?
A. He used to worked for Capco.
Q. But he changed his job?
A. He changed his job to -- actually, went from Capco to Hall in Bristol, and then to Whaling City.
Q. Are you earning approximately the same salary as you were back in 2003, 2004?
A. I had another job also which I don't have any longer. So I earn less now.

Page 9

Q. Less now?
A. Yes.
Q. And you were earning roughly about -- do you recall what you were earning back in 2003, roughly?
A. I don't.
Q. Do you know the annual salary -- has your annual salary gone up -- joint salary or joint income gone up since 2003, 2004?
A. Probably about the same.
Q. The same. Would about $55,000, $60,000, would that be what you're making jointly between you and your husband?
A. I would say 45 is probably close.
Q. And it was roughly the same area back a couple -- two or three years ago as far as the salary range?
A. I believe so.
Q. Where is -- is it Whaling?
A. Whaling like a whale.
Q. Where is that located?
A. It's on Logan Street in New Bedford.
Q. And the official name of the company again?
A. Whaling City Iron.
Q. Whaling?

Page 10

A. City.
Q. City?
A. Iron.
Q. Iron. And he's in purchase and sales. What does he do there? What do they do at the company?
A. Steel, iron. I don't know.
Q. So he deals with contractors and stuff like that who need steel?
A. Yes.
Q. Do you know what he makes? Does he get a salary or per hour?
A. I believe it's $50,000.
Q. $50,000 per year?
A. Yes.
Q. Currently?
A. Yes.
Q. And what's your annual salary?
A. Mine's about between 12 and 15.
Q. Okay. Now, you, at some point, lived in Portsmouth, Rhode Island; correct?
A. Yes, I did.
Q. And the house was located at 98 Greenfield Avenue in Portsmouth?
A. Yes.
Q. And you and your husband owned the property

Page 11

jointly?
A. Yes, we did.
Q. And how long -- from what years did you live in that house?
A. We lived there for seven years from, I believe, 1997 until 2004.
Q. Okay. And you and your husband jointly owned the property; correct?
A. Yes.
Q. And in late 2000 -- well, in the spring of 2003, you filed -- I believe in May, you filed for Chapter 13 bankruptcy; correct?
A. Yes.
Q. And that was in May of 2003?
A. Yes.
Q. And you were at the Greenfield Avenue house at the time; correct?
A. Yes.
Q. And you had three mortgages, as I understand, on the property; correct? Do you recall?
A. Yes, we had the original, a second with -- yes, and then there was a very, very small like $2,500 third.
Q. Citi Mortgage; correct?
A. Yes.

Page 12

Q. Then there was Green Tree, which was transferred to Conseco?
A. Yes.
Q. And then there was the HH, Household Finance; correct?
A. Yes, that one I didn't know was actually a mortgage until we paid it off. We just thought it was a loan.
Q. Who generally handles the finances in the house, you or your husband?
A. Probably both, maybe myself more.
Q. If you had to divvy up -- in my circumstance, pretty much my wife handles the finances. I'd say about 80 percent of it.
A. I would say that.
Q. I've got maybe some veto power, not much though. What would you say your percentage of handling finances and things like mortgages -- how would you say generally the percentage --
A. Because I'm home more, I would say I do maybe 85 percent of it.
Q. So you were in Chapter 13 as of May?
A. Yes.
Q. And I believe your first contact with Domestic Bank was sometime in late November of 2003?

Page 13

A. Yes.
Q. Now, between those intervening months, which is roughly around six months, did you contact any banks --
A. Yes.
Q. -- to try and deal with the Chapter 13 situation?
A. Yes.
Q. Specifically to get a loan to pay off the Chapter 13 debt?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. In fact, you used to work at a bank; correct?
A. Years ago, yes.
Q. What bank was that?
A. I worked for a few. I worked for Bank of Newport, and I worked for Citizens.
MR. DELUCA: Just for the record, Gini Spaziano came into the deposition. Gini is also -- she's my supervisor, and she's sitting in during the deposition. She's in the room.
Q. So you worked for Newport Bank?
A. Bank of Newport.
Q. Citizens Bank?
A. At Citizens.

Page 14

Q. And what other banks?
A. I worked very, very briefly for Navy Federal Credit Union.
Q. And what did you do for -- what was your job description or what did you do for the bank?
A. Teller.
Q. Did you process any loans or anything like that?
A. No.
Q. Were you ever in any loaning department or lending department?
A. No.
Q. Did you ever deal with anybody who was in the lending or the loaning departments when you were at these various banks?
A. No, no.
Q. So from May to November, though, you contacted several banks yourself?
A. Several.
Q. Approximately how many did you attempt to in order to get a consolidation loan to pay off the Chapter 13 debt before you spoke with Domestic?
A. Maybe eight to ten. It's just a guess.
Q. And did you make those calls yourself?
A. Yes, I did.
Q. And how did you initiate those calls?

Page 15

A. Searches on the Internet or the newspaper.
Q. So you took it upon yourself to do research, find out who could possibly lend you money, and you made the calls?
A. Yes.
Q. And do you remember some of the names of the banks that you contacted?
A. I don't. I mean, it would just be a guess at this point.
Q. Were any applications taken?
A. I'm sure there were. I mean --
Q. Did you sign any application documents from any of those eight to ten banks?
A. I don't remember.
Q. Do you have any application documents in your possession?
THE WITNESS: On those?
MR. DELUCA: Yes.
A. No, not in my possession.
Q. Do you have any correspondence from any of those banks?
A. Not any longer, no.
Q. Your phone number at the time at the house was 683-3942?
A. I believe so, sounds familiar.

Page 16

Q. Was that where you made the calls from?
A. Yes.
Q. And who was your subscriber at the time, Verizon?
A. It was either Verizon or Cox. I'm not sure at that time who it was.
Q. And was that account at the 98 Greenfield Avenue home?
A. Yes.
Q. And on any of those eight or ten contacts that you initiated, were you able to obtain a consolidation loan to pay off the Chapter 13 debt?
A. No.
Q. And were you in arrears as to the Citi Mortgage, Conseco, Green Tree and Household Finance loans?
A. Well, not at the time because they were under the Chapter 13 plan, so we were up to date on any Chapter 13 payments.
Q. But you were looking to pay off the Chapter 13?
A. Right. We wanted to get out of the whole thing.
Q. You wanted to make good on them; correct?
A. Right.
Q. And you never got approval from any one of those eight to ten; correct?
(NO VERBAL RESPONSE)

Page 17

THE REPORTER: I need a verbal response.
A. No.
MR. DELUCA: One other rule is she -- the stenographer cannot take down a nod or -- I know we all gesture and tend to do that. If you could just enunciate your answer; okay? Just so the record is clear.
Q. So in November, late November of 2003, somewhere or another, you got in contact with Domestic Bank; correct?
A. No, I did not get in contact with Domestic Bank.
Q. Tell me how it is that there was -- at some point, there was an application taken over the phone; correct?
A. Dorothy Vieira phoned me.
Q. Do you know how she got your phone number?
A. I do not.
Q. And so you're saying they contacted you?
A. Yes, they did.
Q. And prior to November of 2005, when was the last time that you had contacted a bank of your own accord prior to hearing from Dorothy Vieira?
A. I have no idea. I don't know.

Page 18

Q. Did you call any in the month of November of 2003?
A. Probably did.
Q. So you're convinced that Dorothy Vieira called you out of the blue?
A. I'm certain.
Q. And an application was taken over the phone; isn't that correct?
A. Yes.
Q. And how do you know -- did the person identify themselves as Dorothy Vieira?
A. She identified herself as Dorothy Vieira, and I asked her to hold for a moment, and I checked on the Internet to see if there was a Domestic Bank. I never heard of it before.
Q. Okay. How did she identify herself as far as her title or job?
A. She said she was a loan processor or customer service representative. I'm not exactly certain.
Q. Did you find Domestic yourself on the Internet?
A. As I was talking to her, I looked it up to verify.
Q. Not before?
A. I had never heard of them before.
Q. Okay. And how long did you -- do you remember when you spoke with Dorothy Vieira?

Page 19

THE WITNESS: The first day?
Q. Yes, when the actual -- she took a phone application; correct?
A. She took a phone application.
Q. If I were to suggest November 25 or 24, right around there, of 2003, would that be approximately the date?
A. It was late November, but I'm not certain of the exact day.
Q. Okay. And what information did you give Ms. Vieira over the phone; do you recall?
A. Just the basic loan information, jobs and names.
Q. Did you provide your Social Security number?
A. I believe so.
Q. Did you provide your husband's name?
A. Yes.
Q. And his Social Security number?
A. Yes.
Q. And did you provide or confirm your home phone number?
A. Yes.
Q. Did you tell her where you both worked?
A. Yes, I did.
Q. Did you provide her with your -- roughly you and

Page 20

your husband's annual salary?
A. Yes.
Q. Do you remember telling her that you were a coordinator at Smart Staffing?
A. Yes.
Q. And your husband was a manager of equipment at Capco Steel?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. And did you tell her about the outstanding mortgage debt -- well, let me go back. Did you tell her the reason why you needed a loan?
A. I actually told her exactly when she called me that I didn't think she would be able to help us because of our situation, and I didn't want to waste my time having a discussion with her. And at that time, she assured me that they had programs designed for this type of situation.
Q. So you continued with -- as a result of that, you continued with the application process?
A. Correct. I would not have continued with that had I not disclosed that up front.
Q. At that point, she didn't guarantee you that there would be any approval of any loan; correct?

Page 21

A. Obviously not. She took my information.
Q. And she told you, obviously, that she would have to process it?
A. Right.
Q. Gather further information concerning the debt?
A. Right, appraisal, whatnot.
Q. Confirm -- get an appraisal; correct?
A. Yes.
Q. Confirm your income, confirm your Chapter 13 debt, all that kind of stuff; correct?
A. Yes.
Q. And did you tell her what you owed relative to your Citi Mortgage, Conseco, and Green Tree and Household Finance mortgages?
A. I did tell her, and she ran a credit report, and she had the information.
Q. And do you recall telling her that your balance on the Citi Mortgage was $145,000?
A. I do not remember the exact figures at that time.
Q. If the written application were to reflect that, do you dispute that that's what you told her?
A. No.
Q. If the written application said that the Green Tree was $23,000, would you dispute that?

A. No.
Q. If the Household Finance said that the outstanding was $2,500, would you dispute that?
A. No.
MR. DELUCA: May I have this marked as Defendant's Exhibit A?
(DEFENDANT'S EXHIBIT A MARKED FOR IDENTIFICATION)
Q. I'm showing you A, the information, just take a quick look at the first and second pages, Mrs. Souza.
(WITNESS COMPLIES)
(OFF THE RECORD)
Q. Did you have a chance to look at the first two pages?
A. I did.
Q. Would you say that the information is accurate as far as your Social Security number, employment, debt calculation, what she -- what you reflected to her that day?
A. Yes, other than she spelled our names wrong.
Q. With the S instead of a Z?
A. Yes.
Q. Okay. Understood. So the first two pages are accurate. Did she go over with you or ask you any



further information; do you recall?
A. The little check-off boxes, I believe we went through those.
Q. You recall going through on the second page Items A through M with her?
A. Yes. She just read them off.
Q. Can you look at those items and tell me if they accurately reflect what you told her during that phone conversation?
(PAUSE)
A. The last one I don't know what those initials are, but everything else looks okay.
Q. Okay. Now there's a specific question here on Item F, it says, "Are you delinquent" -- "Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond or loan guarantee? If 'Yes,' give details describing in the preceding" -- it says, "Give details described in the preceding question." You answered, and you answered for your husband "No"; correct?
A. Right.
Q. And it says, "Other loan." You had the three that you had indicated -- obviously, they were true, that you had those three?



A. Right. I don't know what the federal loan means.
Q. Well, it says federal debt. Do you recall that question?
A. I guess. I don't really.
MR. DELUCA: Okay.
A. I don't believe I had any federal debt. I don't know what federal debt is.
Q. Okay. Well, would you consider an IRS lien or outstanding taxes to be federal debt?
A. I'm not sure. I guess it would be.
Q. Did you tell Ms. Vieira during the telephone interview that both you and your husband as of 1999 were -- had about $10,000 of federal debt in taxes?
A. No, we had taxes -- yes, those were included in the Chapter 13.
Q. But did you tell her that you had federal debt in the form of back taxes that you owed?
A. I'm not sure if we discussed that specifically, that tax.
Q. Did you feel a need on that question Number F that you should disclose to her that you had some IRS lien --
A. I --



(OFF THE RECORD)
Q. Did you feel that you should have or did you understand the question federal debt sufficient enough to feel that you should disclose in applying for a loan that you had owed taxes in the amount of approximately $10,000 from 1999?
A. If I understood the question, I would have disclosed any information she needed. I understood that as a federal mortgage loan, I thought that was. Our other debt was included in the Chapter 13 which was there for her to see and --
Q. Federal -- I'm sorry. Finish your answer. I'm sorry.
A. We may have discussed the taxes or any other bills because we did go over all bills that we had outstanding.
Q. Okay. You see the word "Federal" in that particular --
A. I do.
Q. And it's capitalized?
A. Yes.
Q. Would that kind of designate that means government?
A. I assume so, yes.

Q. Okay. And you did, in fact, as of the time of that application have -- owe the government approximately $10,000 in taxes; correct?
A. I believe probably around there. I don't know the exact figure.
Q. But that wasn't disclosed to Ms. Vieira; correct?
A. It was disclosed to her in all of our outstanding debt that we had.
Q. But it wasn't disclosed in the initial application; yes or no?
A. It may have been. I don't remember. We went through everything together on my credit report.
Q. Based on the document, is it disclosed?
A. I don't remember.
Q. Well, I'm asking you to look at Page 3, and ask for an explanation. Is it disclosed or explained on Page 3 of that initial application?
A. She checked "No."
Q. And you checked for your husband "No"; correct?
A. I didn't check these.
Q. She did that?
A. She did.
Q. Based on what you told her; correct?
A. Right, but we discussed all of our outstanding debt, what was on the 13, and we reviewed my



credit report and my husband's.
Q. Is there any detailed description as to where the federal tax debt of 1999 was and whether it was part of the Chapter 13 bankruptcy on that paper?
THE WITNESS: On this paper?
MR. DELUCA: Yes.
A. No, nothing separates anything that was on the Chapter 13 on this paper.
Q. Now, did you not disclose the tax situation with the federal government because you were afraid that that might affect adversely your application?
A. Absolutely not.
Q. Okay. She asked you for a letter of explanation; correct?
A. Yes, she did.
Q. And you provided a letter of explanation dated November 6, 2003, or roughly thereabouts, shortly after the application?
A. Yes.
Q. And do you recall telling her that you had made several calls to other banks, and that your credit scores were pulled as a result?
A. Yes.
Q. And that confirms your prior testimony; correct?
A. Yes.



Q. Now, after the initial phone application, you, at some point, authorized the bank to get additional information to process the loan; correct?
A. Yes.
(DEFENDANT'S EXHIBIT B MARKED FOR IDENTIFICATION)
Q. And I'm going to show you Defendant's B. Is that the authorization that you and your husband signed?
(PAUSE)
A. Yes.
Q. And when was the next time that you recall you heard from Domestic concerning your loan?
A. Dorothy and I spoke, I would say, every day.
Q. In fact, in your Answers to Interrogatories, you say that you spoke to either Dorothy or Mr. -- do you recall Mr. Almeida?
A. Yes.
Q. Okay. You did written Answers to Interrogatories in this case?
A. Yes.
Q. Do you remember there were questions -- Interrogatories is a fancy legal term for questions.
A. Yes.



Q. In one of the answers I believe you said that you were in constant contact with them -- and tell me if I'm wrong in characterizing this. From like November through and including February, you were in contact with them about the processing of the loan; correct?
A. Yes.
Q. Do you agree with that statement?
A. I was in contact with them about the status of the loan, maybe not the processing of the loan.
Q. Okay. Now, your bankruptcy attorney was Mr. Iascone?
A. Yes.
Q. And you had an initial appraisal done?
A. We had an appraisal done.
Q. On December 18?
A. Yes.
Q. As part of the process?
A. Yes.
Q. Okay. And the house was appraised at $275,000?
A. I do not remember the figure.
Q. Well, if I were to represent that to you, would you have any reason to dispute that?
A. I don't think so.
Q. Do you remember who came over to do the appraisal?

Page 30

A. I do not.
Q. And you paid for the appraisal yourself?
A. Yes, we did.
MR. DELUCA: Now, can I have this marked as Defendant's C?
(DEFENDANT'S EXHIBIT C MARKED FOR IDENTIFICATION)
Q. In Defendant's C, on the top second -- actually, the second box, that refers to your loan application, doesn't it, that document?
THE WITNESS: Where are you looking? Right here?
Q. Loan Summary; right? And it says Michael and Elizabeth Souza, and it has an appraisal value of $275,000. Do you remember a guy by the name of Ray Bourke coming over and appraising the property?
A. Yes.
Q. Capital One?
A. I don't know the company. That name does sound familiar.
Q. And do you have any reason to dispute that figure on that document?
A. I don't believe so.
Q. Okay. And initially, what were you told -- what

Page 31

amount was the loan that you were to obtain to consolidate your Chapter 13 debt and pay it off; do you recall?
A. I don't. Around, 2, 210, somewhere in that area.
Q. Initially?
(PAUSE)
(NO ANSWER)
Q. Let me ask you this question.
THE WITNESS: You know what? I don't remember.
Q. Was there a change at some point in what the loan amount would be to pay off the Chapter 13 debt?
A. No.
Q. Was there some -- now, do you recall without looking at any documents at this point -- but do you recall that there was a discrepancy between what the bank had been informed by you concerning your outstanding debt and what the actual payoff figures would be?
A. No.
Q. You don't recall or --
A. I know there was not.
Q. There was not?
A. It was very black and white.

Page 32

Q. Did you discuss with Mr. Iascone -- he was your bankruptcy attorney?
A. Yes.
Q. And did you ever discuss with him trying to get what the payoff figure was so the bank could find out what kind of -- or the amount of mortgage you would need?
A. I don't -- say that again.
Q. Did you ever ask Mr. Iascone to go to the Bankruptcy Court to find out what the payoff figure would be under Chapter 13, so you could report to the bank and tell them how much money you needed?
MR. MARRAN: Object. I'm going to object for the record on attorney/client privilege.
(NO ANSWER)
Q. Without telling me conversations between you and Mr. Iascone, did you do that?
A. I did receive a payoff from the Chapter 13 -- from whoever handles that.
MR. DELUCA: Okay.
A. That figure was put out right away.
Q. And were those figures consistent or inconsistent with the initial application?

Page 33

A. Consistent.
Q. Did Ms. Vieira ever discuss with you any discussions she had in mid to early December about conversations with Mr. Iascone regarding the Chapter 13 debt, and what she needed as far as figures were concerned?
A. She let me know what she needed, and anything that she asked for, we gave to her.
Q. Did she ever tell you that was important, that she know the exact number of the Chapter 13?
A. Of course. We needed to know exact numbers, and she was given exact numbers.
Q. And she was given exact numbers on that initial application; correct?
A. Yes. When we obtained the information she requested, that was the exact numbers.
Q. In mid December, specifically December 16, do you know if your attorney contacted Ms. Vieira from the bank concerning what was the actual outstanding debt and payoff on the three mortgages we referenced -- talked about before?
THE WITNESS: Do I know if my attorney contacted her?
MR. DELUCA: Uh-huh.
A. I don't know for certain on that specific day.

Page 34

I wouldn't remember. I don't know their conversations.
Q. Did you have any conversations -- without telling me the substance of them -- with Mr. Iascone in mid December about what ultimately the Chapter 13 payoff figure was for the three outstanding mortgages?
THE WITNESS: Did I have conversations with Peter Iascone regarding the payoff figures?
MR. DELUCA: Uh-huh.
A. I'm sure we did. I don't think we discussed. It was information we got from the Bankruptcy Court.
Q. Did he ever advise you that you, in fact, owed roughly around $10,300 more than what was represented to Ms. Vieira initially in November of 2003?
A. I don't believe so.
(OFF THE RECORD)
(DEFENDANT'S EXHIBIT D MARKED FOR IDENTIFICATION)
Q. Did Mr. Iascone tell you whether the ultimate payoff figure from the Chapter 13 -- whether that included the actual three mortgage debts?

Page 35

THE WITNESS: I'm sorry. Could you say that again?
Q. Yes. You had a Chapter 13 situation; correct?
A. Uh-huh.
Q. And that included mortgage debt as well as some personal debt; correct?
A. Yes.
Q. Did Mr. Iascone advise you in mid December that the payoff figure included the mortgage debt of the three, Citi Bank, Conseco and Household Finance?
A. All I know is that the Chapter 13 payoff included any arrearages we had on our mortgages.
MR. DELUCA: Okay.
A. So obtaining the payoff from the trustee's office would have included --
Q. Those three debts?
A. -- those three debts.
Q. Okay. The mortgage debts?
A. Right.
Q. Okay. Do you know who obtained the numbers from -- well, numbers were eventually obtained as to what the payoff would be from Citi Corp., Conseco, and then Household Finance; correct?
A. Yes.

Page 36

Q. Do you know who obtained the numbers for the payoff?
A. I believe Domestic did. I believe the bank has to get the payoff figures, correct.
Q. Well, who worked with those three institutions to obtain the payoff figures; do you know?
A. Whoever does that at Domestic.
Q. It wasn't your attorney, Mr. Iascone?
A. I don't know who actually put the order in for the payoff for the bank.
Q. Did you have Mr. Iascone contact Citi, Conseco and Household Finance to work with them to try and reduce the amount of the mortgage debt that you had in the Chapter 13?
A. I don't know if he did that or not. I don't believe that he did, but I can't say for sure.
Q. He was your bankruptcy attorney; correct?
A. Yes.
Q. And he was working on the bankruptcy case; correct?
A. Right.
Q. And obviously, he had an interest, and part of his job was to reduce your exposure in Bankruptcy Court; correct?
A. I guess.

Page 37

Q. And try and reduce how much you would have to loan -- how much of a loan you would have to get to pay off those; correct?
A. I'm not sure what he did on his own. I believe we just took it at face value of what we owed and --
Q. Did you converse with him on a daily basis as to what amount of debt would be -- what your Chapter 13 debt would be and what your mortgage payoff figures would be?
THE WITNESS: I'm sorry?
Q. Did you converse with Mr. Iascone about what your payoff figures would be concerning the Chapter 13 debt?
A. I'm sure we've talked about it, but it was what it was, and the banks weren't going to budge on the figures because the figures were -- it was what it was.
Q. Have you ever seen this fax transmittal and the document attached to it, Defendant's D? It says from Peter Iascone to Dorothy Vieira, and it's dated 12/16/03, and it says regarding Souza. Have you ever seen that and the second page which has payoff figures?
(PAUSE)

Page 38

A. No, I don't --
Q. You have no idea?
A. No.
Q. Do you know whose handwriting that is on Page 2?
A. No, I don't.
Q. Would you agree with me that the payoff figures -- it says, "Payoff" here; correct?
A. Yes.
Q. And this fax is dated December 16, 2003; correct?
A. Correct.
Q. And it's from Mr. Iascone to Dorothy Vieira; correct?
A. That's what it says.
Q. And this was done on your behalf; correct?
A. I would assume so.
Q. You had retained Mr. Iascone; correct?
A. Yes.
Q. And it says in handwriting here, it says, "Payoff"? Would you agree with me it says "Payoff" on Page 2?
A. It says, "Payoff."
Q. And it looks like Citi, C-I-T-I?
A. Okay. Yes.
Q. Then it says $150,950; correct?
A. That's what that says.

Page 39

Q. So that's more than -- approximately $6,000 more than the figure that you had provided Ms. Vieira back in November; correct?
A. Any figure that I provided her was from documents. He may have been guesstimating. I didn't write that, so I have no idea where he got that figure from.
Q. But would you agree with me that that's more than what you had represented to Ms. Vieira?
A. Yes, he may have -- I think he was trying to go higher.
MR. DELUCA: Okay. I'm going to move to strike the answer.
Q. The question is yes or no. Is that higher than what you had told Ms. Vieira?
A. I don't remember what I told Ms. Vieira.
Q. Well, you said earlier it was 145?
A. Yes.
Q. Now, Conseco, it says $25,8 -- it looks like 27. Would you agree with me that's what that says?
A. That's what that says.
Q. And would you agree with me that that is more than the $23,000 figure, roughly by $3,000, than what you told Ms. Vieira; correct?
A. Yes.

Page 40

Q. And the Household Finance, $2,978, that's more than the $2,500 you had represented in the initial loan application?
A. On that paper, yes.
Q. Okay. And here it has a figure of $10,327; correct?
A. Yes.
Q. And were you told that that was -- were you ever told by your attorney -- was this document ever provided to you? Let me ask you that.
A. No, I don't know what that is.
Q. Did you ever talk to your attorney about these figures, Mr. Iascone?
A. Not that I recall.
Q. He never advised you that those were the ultimate payoff figures?
A. Not that I recall.
Q. He never advised you that the actual mortgage debt was about $10,000 more than what had been initially told to the bank?
A. Not that I recall.
Q. Do you agree with me that because the -- if assuming that the $10,000 was more than what was told to the bank initially in November, would you agree with me that if there's $10,000 more in

Page 41

debt, your loan necessary to pay off the Chapter 13 would increase?
MR. MARRAN: Objection.
A. I don't know.
Q. Did it increase?
THE WITNESS: Did our loan amount increase?
MR. DELUCA: Yes.
A. I don't believe that it did.
Q. At some point, you had a figure of $202,100?
A. That's sounds familiar.
Q. Okay. You don't remember a figure of 85 -- $185,000?
A. No.
Q. Now, did you ever -- I'll withdraw that question. Did Ms. Vieira ever discuss with you the issue of -- I'll withdraw that question. Did you ever review or discuss with Ms. Vieira what was required other than the Chapter 13, what other documents the bank normally requires as a standard practice in order to complete an application?
A. She said we needed an appraisal, and she said we needed the payoff figures, obviously; other than the obvious, job, payroll information, things like that.

Page 42

Q. Did she ever tell you anything about the building permits or anything like that?
A. No.
Q. Did you ever -- eventually, she sent out the bank's own appraiser?
A. Right, after everything was done.
Q. And that was on January 8, I believe, of '04; correct?
A. I was told that that was not a technical appraisal. It was someone that was sent on behalf of the owner of the bank. It's just something he does. It's his kind of right-hand man. That's what I was told. It was not an appraisal.
Q. But by that time, Defendant's D, which indicates $10,000 more in the mortgage debt, that had already been established; correct?
A. Everything was settled. They had given us a commitment letter, and asked us to proceed to the Chapter 13 court and get it dismissed.
Q. When you say you received a commitment letter, that's a good topic to get into. Did you ever receive this document -- I'll mark this as Defendant's Exhibit E -- from the bank?
(DEFENDANT'S EXHIBIT E MARKED FOR IDENTIFICATION)

Page 43

(PAUSE)
A. I don't recall if we had this or not.
Q. Would you agree with me that that document -- I'll represent this to you, that this document was introduced by your attorney at Mr. Vescera's deposition on April 4, 2004; okay? Your attorney used it as an exhibit. And it says at the top -- do you agree with me, it says Domestic Bank Commitment/Residential Mortgage?
A. That's what is says.
Q. And it says at the top the word in bold "Commitment"; correct?
A. Yes.
Q. Do you see any portion of this document either executed with any numbers, addressed to you, signed by you or signed by any representative of the bank on any page?
A. This is blank.
Q. So the answer is no?
A. The answer is no.
Q. Okay. And you don't recall ever getting this type of form --
A. I don't recall.
Q. -- or letter? No?
A. No.

Page 44

Q. Now, the letter that they're talking about is dated -- well, it's faxed December 22, 2003; do you recall that?
A. Yes.
Q. And how is it you recall the fax number?
THE WITNESS: How is that what?
Q. How do you recall when it was faxed?
A. I looked at that recently.
Q. Did you look at the request for any documents before the deposition?
THE WITNESS: Did I request --
Q. Did you look at any documents before coming to the deposition?
A. A few.
Q. Some of these documents that we're introducing here?
A. A couple.
Q. Okay. Did you review your Answers to Interrogatories?
A. No, I didn't.
Q. Now, that document dated December 22 was not sent to you directly; correct?
A. I don't think it was. I think it was sent to Peter Iascone.
Q. Right. And that was for purposes of obtaining or

Page 45

trying to obtain the Chapter 13 approval; correct?
A. Yes. So he could get the payoff, pay off the 13.
Q. It wasn't directed to you. It was directed to the bankruptcy attorney; correct?
A. I was under the impression it was for myself, my husband and the bankruptcy attorney.
Q. Well, here's the letter. I'm not going to mark it, but is it directed to you -- or does it say, "Dear Mr and Mrs. Souza," or does it say, "Dear Mr. Iascone"?
A. It says Mr. Iascone.
Q. Okay. And do you see anything here -- the wording commitment in that letter; yes or no?
A. I see the word approved.
MR. DELUCA: Move to strike.
Q. The question is do you see a commitment --
A. No.
Q. Do you see a figure in this letter as to what the loan would be?
A. Yes.
Q. Okay. Do you see when the closing date was in this letter?
A. No.
Q. Do you see a term amount or an interest rate in

that letter?
A. No.
Q. Do you see a type of loan in that letter?
A. No.
Q. Do you see a closing date in that letter?
A. No.
Q. Do you see an application number on that letter?
A. No.
Q. Do you see your signature as a borrower on that letter?
A. No.
MR. DELUCA: F and G.
(DEFENDANT'S EXHIBITS F AND G MARKED FOR IDENTIFICATION)
Q. I'm showing you two documents. One is a Loan Processing Checklist, Mrs. Souza, and one is a Required Documents list. On both F and G, do you and your husband's names appear at the top of those documents?
A. Yes, they do.
Q. And if you look at specifically Exhibit G, it has you and your husband, and it has the property 98 Greenfield Avenue, Portsmouth, Rhode Island; correct?
A. Yes.



Q. And it has -- it looks like application date, initial application date -- well, it says NIA date 12/25/03, but application date 11/25/03?
A. Yes.
Q. Have you ever seen this document before?
A. I have not.
Q. Did you see this in your review in preparation for the deposition with your attorney?
A. I did not.
Q. Now, this looks pretty much like a standard like printout letter?
MR. MARRAN: I'm going to object to the characterization.
A. I don't know what a standard printout letter would look like.
Q. Okay. But it says Loan Processing Checklist; okay?
A. Yes.
Q. If I were to represent to you that that is a normal letter that the bank -- or normal document that the bank produces in the course of application -- loan applications, do you have any reason to dispute that this is the original document from the bank?
MR. MARRAN: Objection to the



characterization.
A. I don't know what they use in their process.
MR. DELUCA: Okay. Fair enough.
Q. Would you agree with me that if you look down the line here on the left-hand column, it says -- under Required Documents, it says Copy of Building Permit. Would you agree with me that that's what it says?
A. That's what it says.
Q. Okay. And on the Required Documents, there's a long list of required documents on the Exhibit F; correct?
A. Correct.
Q. And some of these documents were, in fact, provided, for example, W-2s; right?
A. Yes.
Q. Pay stub earnings?
A. Yes.
Q. Bankruptcy discharge?
A. Yes.
Q. So this sounds like pretty standard stuff for a bank relative to processing; correct?
MR. MARRAN: Objection to the characterization.
A. I would assume.



Q. But this was some of the things that the bank did, in fact, do; correct?
A. Correct.
Q. Okay. And -- let's see. Down about maybe two-thirds of the way down, it says Copy of Building Permit as well; correct?
A. Correct, but we weren't building.
Q. But it says Copy of Building Permit?
A. It says that on the paper.
Q. Okay. Now, when there was a second appraisal done, that was done on January 8 of 2004; correct?
A. Well, I disagree that it was an appraisal. That was not what the man was -- that's not what I was told the man was being sent out to do.
Q. Well, did a man by the name of Leonard come out to your house and look at the house?
A. He did. He walked through and chatted with me for a few minutes. He didn't really look at anything.
Q. And for whatever reason he was there, he did look at the house; correct?
A. Briefly.
Q. Okay. Did he look at the exterior back of the house?
A. Yes, he took a walk around the yard.

Page 50

Q. Okay. And did you discuss with him that there was some additions done in 1998 and 1999 to the house?
A. Yes.
Q. You remember having that discussion with him?
A. Very briefly.
Q. And, obviously, he would want to know about the additions to evaluate the house; correct?
MR. MARRAN: Objection.
(NO ANSWER)
Q. Wouldn't common sense dictate that he was interested in knowing about any additions so that he could get an appraisal of the house -- to confirm --
MR. MARRAN: Objection. Sorry.
Q. -- an appraisal?
MR. MARRAN: Objection.
MR. DELUCA: You can answer.
A. He did ask about those, and that he would like to see a building permit, which we had, and I provided immediately. We would not have been able to have the work done without a building permit.
Q. Did he go inside the house?
A. Yes.
Q. So he went inside the house? Did he go into the rooms of the house?

Page 51

A. Not really. He just chatted with me in the kitchen for a few minutes.
Q. Okay. And he went in the exterior of the house; right?
A. I think he just walked through the backyard.
Q. Okay. And he asked you about some additions that were done; correct?
A. He either asked me at that time or he called me immediately thereafter.
Q. Do you remember -- so shortly within that period, you faxed him over -- and he requested a copy of the permits; correct?
A. He requested it, and I immediately obtained it, and sent it to him.
Q. Okay. That was how soon after that meeting that you had when he looked at the interior and exterior?
A. Probably that afternoon.
Q. The same day?
A. I believe the same day, if not the next day.
Q. And you faxed it from your house?
A. Yes.
Q. And that was (401) 683-3942?
A. Yes.
(OFF THE RECORD)

Page 52

(DEFENDANT'S EXHIBIT H MARKED FOR IDENTIFICATION)
Q. Showing you what's been marked as Defendant's Exhibit H -- well, before I do that, after that meeting -- you don't agree it's an appraisal, but I think it is --
A. I do not agree.
Q. He requested building permits as to the two additions; correct?
A. Yes, he did.
Q. And you went to the city hall or town hall in Portsmouth, obtained the permits, and immediately faxed it over to him that same day; correct?
A. Yes, either that day or the next day.
Q. Okay. And do you remember if that was faxed in the afternoon or the morning?
A. I don't recall.
Q. Okay. Look at, if you could, Defendant's H.
(WITNESS COMPLIES)
A. Okay.
Q. Is that your handwriting on the first page of H?
A. Yes, it is.
Q. And it says to Dorothy V from Liz Souza?
A. Yes.
Q. And it says, "Building permits for work done on

Page 53

house in '98 and '99, 3 pages"; correct?
A. That's it.
Q. And that's the three-page fax that you sent to her?
A. Yes.
Q. And that's dated at the top January 8, 2004, at 1:48 p.m.; correct?
A. Yes.
Q. You don't dispute that?
A. No.
Q. Would that be an accurate time and date that you faxed those permits over to the bank?
A. Yes, it would.
Q. Okay. And Pages 2 and 3, those are the permits for the work that was done to the rear of the house; correct?
A. Yes.
Q. That Mr. Leonard -- I'll use Mr. Leonard -- was concerned with; correct?
A. Yes.
Q. And wanted confirmation that you got proper approval for the work; correct?
A. Yes.
Q. And would you agree that proper approval would -- whether or not there was proper approval may

Page 54

affect the value of the collateral or the home?
A. Would I agree? No.
Q. But you nonetheless provided them on that date, and you don't dispute that?
A. Right.
Q. Now, based on the documents F and G, the permits were required according to those documents to complete the application?
MR. MARRAN: Objection to the characterization.
A. I don't know.
Q. According to these documents, F and G, they needed as required documents permits -- any permits for additions done to the house; correct?
MR. MARRAN: Objection, same objection.
A. I don't see it checked on there, and they never requested it prior to that.
Q. But you don't dispute that these documents, F and G -- G and F state that; correct?
MR. MARRAN: Objection to what they state, "state that."
(NO ANSWER)
Q. Well, as I went over with your testimony before, those permit requirements are in these documents;

Page 55

correct?
A. There's a lot of things in those documents.
Q. Well, you don't dispute that they say --
A. They say a lot of other things, also.
Q. I understand, and there's a lot to a loan that has to be done to process it, but without saying -- you don't dispute that F and G state that a copy of the building permit is part of the application process?
MR. MARRAN: Objection.
A. It's printed on that paper.
MR. DELUCA: Okay. That's fine.
Q. And as of January 8, had you received that commitment -- you didn't receive that commitment form, that two-page blank form, you hadn't received that by then; correct?
MR. MARRAN: Would you identify what form?
MR. DELUCA: Yes, Exhibit E.
A. We were not aware that that form existed. We were under the impression that the form -- the paper that we received was what was needed to move ahead with the loan.
MR. DELUCA: I understand your impression. It's nonresponsive, so I move to

Page 56

strike.
Q. But my question is yes or no. Did you receive Defendant's Exhibit E by January 8 of 2004; yes or no?
A. I don't think we did.
Q. Okay. And did you --
THE WITNESS: Can I add something?
MR. DELUCA: No, there's no question pending. Your attorney will have his opportunity, if necessary, to ask you questions.
Q. There was a trustee in your Chapter 13, Mr. Boyajian; do you remember that?
A. Yes.
Q. Did he ever advise you or tell you what your payoff figure would be?
A. He did provide us with a payoff figure.
Q. Okay. Did he advise you that the payoff figure was approximately $10,000 more than what was initially represented in November of 2003?
A. No.
Q. Did he provide -- do you know if he was in touch with your bankruptcy attorney concerning what the payoff figure would be?
A. I do not know.
Q. Do you know if he faxed him any information

Page 57

concerning your mortgage debt and other debts?
A. I do not know.
Q. I'm not going to mark this as an exhibit, but I'm going to ask you some questions concerning this. Maybe we'll mark it for identification.
(OFF THE RECORD)
(DEFENDANT'S EXHIBIT I MARKED FOR IDENTIFICATION)
Q. Would you agree that I is something sent from Mr. Boyajian to Peter Iascone on 12/15/03?
MR. MARRAN: Object.
Q. Is that what the document says?
A. It says this is a document sent to Peter Iascone, I guess.
Q. What's the date on the fax?
A. December 31.
Q. Okay. And well, this -- let me withdraw that question. The December 31 date, do you know who this was faxed to? If I told you or advised you that was faxed to the bank on that date, December 31, would you have any reason to dispute that?
MR. MARRAN: Objection.
THE WITNESS: Would I have a reason to?

Page 58

MR. DELUCA: Yes.
A. I have no idea what this is all about. I don't know.
Q. Okay. Well, Mr. Boyajian, as trustee, was working on apparently the payoff figures relative to the Chapter 13?
MR. MARRAN: Objection to the representation.
(NO ANSWER)
Q. Would you agree with me that at the bottom of that page the payoff figures were consistent with that letter from Mr. Iascone that I showed you on December 16?
A. Yes.
Q. The fax to Dorothy Vieira?
A. Yes, they look the same.
Q. And roughly about $10,000 more than the initial application?
A. Possibly.
Q. Well, the figures are the same figures; correct?
A. Yes.
Q. The letter that you got from -- eventually, you got a letter stating that your application had been denied, and that was dated -- that was in February?

Page 59

A. Yes.
Q. Did you get a call from the bank before then, verbal call?
A. Yes.
Q. Do you remember what date that you got a call from a representative of the bank?
A. No.
Q. Was it before the letter was sent to you?
A. I believe it was.
(OFF THE RECORD)
Q. Was it sometime in January or in December that you recall you got a call from somebody from the bank?
A. I don't remember.
Q. Was it Ms. Vieira or somebody else?
A. I don't remember which one it was.
Q. Okay. Do you remember if it was a male or female?
A. I don't know.
Q. And how soon after that did you get the credit denial letter?
A. I don't remember exactly when.
(OFF THE RECORD)
(DEFENDANT'S EXHIBIT J MARKED FOR IDENTIFICATION)
Q. Take a look at J, have you seen that document before?

Page 60

A. Yes.
Q. Okay. They sent that to your home on Greenfield?
A. Yes.
Q. In Portsmouth?
A. Yes.
Q. And it's dated February 5, 2004?
A. That's what it says.
Q. Okay. And it says refinancing for first mortgage, and your application was denied; correct?
A. That's what that says.
Q. Okay. And it's signed by a representative of the bank?
A. I guess.
Q. Okay. It says Gary Garabedian at the bottom of that?
A. I don't know who he is.
Q. Never spoke to him?
A. No.
Q. The amount of the loan was $202,100?
A. Yes.
Q. And there is a box marked off, it says, "Delinquent credit obligations"; correct, on that?
A. Yes.
Q. Okay. And there's a separate box marked off; correct? It says garnishment, wages, et cetera?

Page 61

A. Right.
Q. But it does say on a separate line, "Delinquent credit obligations"; correct? Do you agree with that? Can you read that out loud, the first box that's marked in the left-hand column?
A. For delinquent credit obligations, and garnishment, attachment, repossession, and bankruptcy.
Q. But the first line says, "Delinquent credit obligations"?
A. If that's the right line, I can't tell. I guess that would be it.
Q. Okay. And between the time that you initially had the written application in November with Ms. Vieira and after looking over those documents, it was determined that your mortgage -- outstanding mortgage debt delinquency was approximately $10,000 more than what was anticipated; correct?
MR. MARRAN: Objection.
A. That was never talked about with me.
Q. Well, you don't dispute that that's what it says in the documents?
A. I see figures on those documents, but that was never talked about with me.